UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KNOLL, INC.,

Plaintiff,

No. 11 cv. 0488 (AKH)
ECF CASE

-against-

MODERNO, INC. AND URBAN MOD, INC.
d/b/a REGENCY SHOP, AND MIKE SAXENA,

Defendants.

---

DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION

Dated: February 21, 2012

Salem M. Katsh, Esq.
Katsh & Associates LLC
64 Main Street
Hastings on Hudson, NY
914 231 7840 (T)
skatsh@katshlaw.com

Robert Tilewick, Esq.
36 Putnam Green, Suite U
Greenwich, CT 06830
203 645 6829 (T)
rtilewick@msn.com

*Attorneys for Defendants*

Table of Contents

I. The Court's Power to Act in The Circumstances ........................................ 2

II. Likelihood of Success on the Merits and Irreparable Injury ........................................ 5

A. The Issue on the Merits Is the Court's Power to Act ........................................ 5

B. Knoll Threatens Permanently to Alter the Status Quo ........................................ 6

C. The Economic Harm Defendants Face ........................................ 7

D. Defendants Seek Modest Relief ........................................ 9

E. *Alphaville* Is An Important Precedent ........................................ 10

F. Knoll's Statement of Its "Present Intention" Is Not Good Enough ........................................ 11

III. Knoll's Defense of Its Actions in Using Confidential Information Is Not The Issue On the Motion ........................................ 12

Conclusion ........................................ 13

Table of Authorities

**Cases**

*Alphaville Design, Inc. v Knoll. Inc.,* C 07 -5569 (N.D. Cal. 2008) .................................10

*Americal Corp. v. Int'l Legwear Group,* 2011 U.S. Dist LEXIS 22155 (W.D.N.C. 2011) ............ 4

*Ardis Health, LLC v. Nankivell,* 2011 U.S. Dist. LEXIS 120738 (S.D.N.Y. 2011) ...........3

*B. & R. Choiniere Ltee. v. Art's-Way Mfg.,* 1979, U.S. Dist. LEXIS 9031 (N.D.N.Y. 1979)..... 10

*Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991).................................................................4

*Garcia v. Teitler,* 443 F.3d 202 (2d Cir. 2006).................................................................4

*Klein v. City of New York,* 2011 U.S. Dist. LEXIS 125375 (S.D.N.Y. 2011) ....................3

*Landis v. N. Am. Co.*, 299 U.S. 248 (1936) .......................................................................4

*Monserrate v. N.Y. State Senate,* 599 F.3d 148 (2d Cir. 2010).......................................2, 3

*Oneida Nation of N.Y. v. Cuomo,* 645 F.3d 154 (2d Cir. 2011) ........................................3

*Owen Equipment & Erection Co. v. Kroger* , 437 U.S. 365 (1978)............................................... 5

*Peacock v. Thomas* , 516 U.S. 349 (1996) ....................................................................... 5

*Riggs v. Johnson County,* 73 U.S. 166 (1868) .................................................................. 5

*Salinger v. Colting,* 607 F.3d 68 (2d Cir 2010) ...........................................................2, 3

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,* 240 F.3d 832 (9th Cir. 2001) .......................... 4

*System Federation No. 91, Ry. Emp. Dept., AFL-CIO v. Wright,* 364 U. S. 642 (1961) ............. 5

*Wal-Mart Stores v. Samara Bros.*, 529U.S. 205 (2000)................................................................ 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KNOLL, INC.,

Plaintiff,

No. 11 cv. 0488 (AKH)
ECF CASE

-against-

MODERNO, INC. AND URBAN MOD, INC.
d/b/a REGENCY SHOP, AND MIKE SAXENA,

Defendants.

---

DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION

Knoll's response to this application for a preliminary injunction only further supports the urgent need for the injunction to be entered.[1] Counsel's declaration in opposition manifestly demonstrates that it is Knoll's standard operating procedure to use third parties extrajudicially to shut down an alleged infringer's business.[2] The status quo *presently* is that Knoll has chosen to

---

[1] "Def. Mem." is a reference to Defendants' Memorandum In Support of Order to Show Cause. "Katsh Decl." is a reference to the Declaration of Salem M. Katsh of February 14, 2012 In Support of Order to Show Cause. The "1st Saxena Decl." is a reference to the Declaration of Mike Saxena of February 13, 2012 In Support of Order to Show Cause. The "2d Saxena Decl." is a reference to the Second Declaration of Mike Saxena of February 21, 2012 In Support of Order to Show Cause. Reference to "Pl. Opp." is to Plaintiff's Memorandum In Opposition to Defendants'' Motion for a Preliminary Injunction. Reference to "Misthal Decl." is to the Declaration of Marc Misthal, Esq. In Opposition to Defendants'' Motion for a Preliminary Injunction.

[2] Knoll's distaste for a fair fight is also reflected in its efforts *judicially* to enforce the trademarks at issue. As noted in the 2d Saxena Decl. ¶ 39, n.2 & Exh. B, Knoll has commenced over twenty separate lawsuits

litigate the parties' rights in a federal court, not extrajudicially. It is also the *status quo* that Knoll has never sought any interim relief from this Court, to halt or restrict Defendants' sales of allegedly infringing goods during the pendency of this litigation.

The relief Defendants are seeking is extremely narrow. All Defendants are requesting is prior *notice* before Knoll launches an extra-judicial attack against Regencyshop.com, Defendants premiere and flagship website. Absent such notice, Knoll could bankrupt Defendants before the merits of Knoll's claims are ever reached. *See generally* 2d Saxena Decl. ¶¶ 1-50. Such action by Knoll would eviscerate the jurisdiction of the Court to decide this dispute.

I. The Court's Power to Act In The Circumstances

Whether assessed under the traditional standards for granting a preliminary injunction, or, given the circumstances here, the ancillary jurisdiction doctrine, it is unquestionably clear that the Court has the power to enter the requested relief—both for the benefit of Defendants and the Court itself.

Regular Standard For Preliminary Injunction. As a threshold matter, Knoll completely mischaracterizes the law when it asserts that the case Defendants cited for the usual standards applicable to a preliminary injunction, *Monserrate v. N.Y. State Senate,* 599 F.3d 148 (2d Cir. March 19, 2010), has somehow been 'overruled' by *Salinger v. Colting,* 607 F.3d 68 (2d Cir. April 30, 2010), and that the *Salinger* case is now the 'only' standard, in ostensible contravention of the test stated in *Monserrate*. *See* Pl. Opp. at 2.[3] *Monserrate* has been cited by the Second

---

to enforce its trademarks on the Mies designs. Not a single reported case has resulted in any decision on the merits. Every one has ended by settlement or default; the defendants in these cases appear to have been selected for their small size and expected inability to afford expensive trademark litigation. *Cf. Wal-Mart Stores v. Samara Bros.*, 529 U.S. 205, 213 (2000) (Scalia, J., warning that product design cases will attract strike suits).

[3] The test, as stated in *Monserrate*, is whether a party can show "(1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to

Circuit, and numerous courts in this Circuit, as recently as a few months ago as a correct statement of the standard for granting a preliminary injunction. *See, e.g., Oneida Nation of N.Y. v. Cuomo,* 645 F.3d 154, 164 (2d Cir. May 9, 2011); *Klein v. City of New York,* 2011 U.S. Dist. LEXIS 125375 *34 (S.D.N.Y. Oct. 28, 2011); *Ardis Health, LLC v. Nankivell,* 2011 U.S. Dist. LEXIS 120738 **5-6 (S.D.N.Y. Oct. 19, 2011).

Nothing in *Salinger* supports the proposition that it overruled all previous articulations of the standards; by its terms, it was addressing preliminary injunctions in the specific context of copyright cases. *See* 607 F.3d at 23. *Salinger* is not now the sole test for granting a preliminary injunction in any context, as can be seen by the numerous decisions since *Salinger* that cite to *Monserrate*.

The facts of this case, as shown below, more than satisfy any postulated standard for granting a preliminary injunction.[4]

The Ancillary Jurisdiction Doctrine. The situation presented on this application, moreover, invokes those cases where courts have acted upon their inherent powers to ensure the integrity of the judicial process. Plaintiff belittles if not virtually denies the inherent power of the Court to protect its jurisdiction to decide this dispute. (Pl. Opp at 4.) But as demonstrated by the precedents cited in Defendants' initial brief, and further cases cited herein, the Court's inherent powers, its "ancillary jurisdiction", is broad and general.

---

make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." 599 F.3d at 154, *quoting Lynch v. City of N.Y.*, 589 F.3d 94, 98 (2d Cir. 2009).

[4] Defendants are well aware, as Knoll points out (Pl. Opp. at 2, n.1), that, although Defendants have not pressed this point, a preliminary injunction can also be granted upon a showing of serious questions going to the merits and the balance of hardships falling decidedly in favor of the movant. The merits of this case, however, are unusual, as discussed below, in that they do not relate to the merits of Knoll's Lanham Act claims but rather to the power of this Court to preserve its jurisdiction. We are well satisfied that we have more than sufficiently justified the issuance of a preliminary injunction under all of the applicable standards.

The Court's inherent powers are clearly not, as plaintiff suggests (*id.*), limited merely to the power to sanction or to address fee disputes. Rather, the Supreme Court, and the Second Circuit, have long defined the powers of the Federal Courts in very broad, general terms, to be tailored to the given circumstances before the Court. As cited in the Defendants' Opening Brief, these cases speak to the fundamental power of a court to protect its jurisdiction to decide the issues before it:

> It has long been understood that certain implied powers must necessarily result to our Courts of justice from the nature of their institution, powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.

*Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991).

And again:

> Without the power to deal with issues ancillary or incidental to the main action, courts would be unable to effectively dispose of the principle case nor do complete justice in the premises. . . . The major purpose of ancillary jurisdiction . . . is to insure that a judgment of a court is given full effect; ancillary orders will issue when a party's actions, either directly or indirectly, threaten to compromise the effect of the court's judgment.

*Garcia v. Teitler,* 443 F.3d 202, 208 (2d Cir. 2006) (quotations and citations omitted).

For example, where a litigant acts needlessly to proliferate litigation, prejudicing the rights of other litigants and the efficient administration of justice, a court may exercise its inherent power to enjoin the litigant's actions. *See generally Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.") These precedents are not limited to their facts; they are rather examples and pronouncements of the breadth and flexibility of this power.[5]

---

[5] *See also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,* 240 F.3d 832, 840-841 (9th Cir. 2001) (upholding district court's authority, during pending litigation, to enjoin trademark holder to direct Customs to release allegedly infringing goods seized by Customs); *Americal Corp. v. Int'l Legwear Group,* 2011 U.S. Dist LEXIS 22155 (W.D.N.C. 2011) (during pending litigation, court may issue

The point of the ancillary jurisdiction or "inherent powers" doctrine, as it applies to the facts here, is that it enables the Court to enjoin the actions of a party who is threatening to prejudice the Court's jurisdiction to decide a case and deprive a party of its day in court.

The facts in this case clearly fall within the ambit of these cases as well as the traditional standards for entering a preliminary injunction.

II. Likelihood of Success on the Merits and Irreparable Injury

In this case, the issues of likelihood of success on the merits and irreparable injury overlap and may be considered together. We will address these and related issues raised by Knoll, as follows:

A. The Issue on the Merits Is the Court's Power to Act

B. Knoll Threatens Permanently to Alter the Status Quo

C. The Economic Harm Defendants Face

D. Defendants Seek Modest Relief

E. *Alphaville* Is An Important Precedent

F. Knoll's Statement of Its "Present Intention" Is Not Good Enough

****

A. The Issue on the Merits Is the Court's Power to Act. On this motion, the question on the merits, in terms of the "likelihood of success" criterion, is whether this Federal Court has the power to preserve its jurisdiction and Defendants' right to their day in court, by use of the Court's equity powers. The cases already cited show clearly that the Court has this power.

---

injunction to prevent trademark holder from "acting through customs officials"; holder "has threatened to notify Customs and Border authorities to confiscate the suppliers' products which it has deemed to be 'counterfeit'" (citations omitted)); *System Federation No. 91, Ry. Emp. Dept., AFL-CIO v. Wright,* 364 U. S. 642 (1961) (power to modify injunctions); *Peacock v. Thomas* , 516 U.S. 349, 355, 356 (1996); *Owen Equipment & Erection Co. v. Kroger* , 437 U.S. 365, 376 (1978); *Riggs v. Johnson County,* 73 U.S. 166 [] (1868)."

That this is an appropriate case for the exercise of this power is shown by the irreparable injury Knoll is threatening to cause to the status quo, to the judicial process, and to Defendants.

B. Knoll Threatens Permanently to Alter the Status Quo. The *status quo* today is that the parties are aggressively litigating the validity of Knoll's trademarks. There is a motion for judgment on the pleadings pending and to be heard on March 13, 2012 before this Court. The parties are engaged in discovery; production of documents has commenced; a protective order is being negotiated; depositions have been noticed; third party subpoenas have been issued; meet and confer conferences are taking place.

If Knoll were to take extra-judicial action that prevented Regencyshop.com from continuing to sell its IBIZA line of products (which Knoll claims infringe its trademarks), the very reason for this litigation would disappear. The Court would have a case lifted and eradicated from its docket without its approval or involvement. The holding of the Supreme Court in its landmark *Landis* decision shows that this motion presents a classic case for the Court to invoke its inherent powers—"to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis*, 299 U.S. at 254.

Knoll heaps scorn upon the notion that an extra-judicial attack on Regencyshop.com would alter the *status quo*. It argues (Pl. Opp. at 5):

> Defendants claim in their papers that their purpose before the court on this order to show cause is to prevent Knoll from shutting down their websites. That, however, is not what their proposed order would do. If Knoll found another infringing website that was connected to, affiliated with or supplied by Defendants, Knoll would be required to give Defendants ten business days notice before taking any action whatsoever, including sending a notice letter.

But apart from elegancecode.com and Regencyshop.com, Defendants have no other websites and Knoll is well aware of that fact. Moreover, Defendants' Proposed Order is

specifically limited to those two websites. (*See* Proposed Order (attached to Order to Show Cause Defendants presented).

Continuing, Knoll argues (*id.)*:

> And what if Knoll was not aware of the connection between another website and Defendants? Defendants surely would not believe that Knoll was not aware of any such connection.

Again, as Knoll well knows, there are no other websites. Knoll further argues (*id.)*:

> Or what if Knoll wanted to amend its complaint in this action to add a party related to Defendants, or to file a separate lawsuit against EleganceCode.com? Defendants' proposed order would require Knoll to provide ten business days notice prior to taking such action, upending the procedures in the Federal Rules of Civil Procedure and Knoll's ability to protect its trademark rights. This does not maintain the status quo.

This argument is patently disingenuous and ironic. For if Knoll wished to seek any form of relief in this Court, whether to amend its Amended Complaint or seek interim relief under Rule 65, Defendants would perforce receive notice of such actions. Notice and an opportunity to be heard are, of course, fundamental tenets of the Federal Rules.

The irony is that it is precisely the absence of the kinds of protections afforded by the Federal Rules that has made this motion—directed toward *extra-judicial conduct without any notice*—necessary.

C. The Economic Harm Defendants Face. Not only is irreparable injury inherent in actions by a plaintiff designed to destroy a defendant's right to its day in court, and effectively to divest the Court of jurisdiction, in this case there is substantial credible evidence of the concrete and irreparable economic harm Defendants would suffer. *See* 2d Saxena Declaration. Mr. Saxena summarizes the harm as follows:

> Regencyshop is my livelihood; any shut down of the website in its entirety would cause catastrophic economic and personal injury.

> Even if the entire Regencyshop.com website were not shut down but we were prevented from selling our allegedly infringing IBIZA line of products, such a shut down would effectively mean the permanent end of our effort to market these products. [2d Saxena Decl. ¶ 2(a), (b).]

In his declaration, Mr. Saxena reviews the background to this motion, explains how his business operates, and why, if Regencyshop were shut down in its entirety, his livelihood would be destroyed. 2d Saxena Decl.¶¶ 3-20.

Defendants would likewise suffer massive and irreparable economic injury from a shut down of the pages on Regencyshop's website offering the IBIZA line of products, which Knoll is challenging in this case. *Id.* ¶¶ 21-43.

The IBIZA products represent Regencyshop's most significant product line, in terms of advertising, sales and revenue. *Id.* ¶ 21.

A successful website aims at increasing the number of "hits"—potential consumers visiting the website. The more "hits", the more prominent the website becomes on search engines like Google. Mr. Saxena's aim has been to create a prominence for the IBIZA line such that, when someone types into Google the search term, for example, "Mies furniture", Regencyshop will appear on the first page of search results. *Id.* To achieve this kind of prominence takes many man-years of effort. ¶¶ 22-28.

The irreparable consequences of a shut down of the IBIZA product line would be manifested on many levels. Given Defendants very small margins, interdicting the sales of IBIZA items would result in substantial monetary losses that in and of themselves could result in bankruptcy. *Id.* ¶¶ 38-39.

Of further major importance is the fact that a shut down of the IBIZA product line would severely erode the sales of other products on Regencyshop's website. The IBIZA line of Mies-designed furniture represents the most prominent Regencyshop products on the Internet—the

products that account for most of the "hits" on the Regencyshop.com website. When a customer is drawn to the website because of his interest in a piece of Mies-designed furniture, he may well, as is very often the case, see some other product that he would rather buy, or he may buy both or several products. It is impossible to estimate in dollar terms the injury to the Regencyshop website if the IBIZA products were removed. *Id.* ¶¶ 28-30. If the IBIZA product line were shut down, the impact on Defendants' business would be enormous and immeasurable:

> Whatever might have been achieved in terms of increased and substantial profits and growth for the Regencyshop website as a whole, and for the IBIZA line itself, would be immeasurable and lost. Whatever profits and benefits might have accrued to Defendants from running the Regencyshop website, in terms of increased and substantial revenues and growth, and in terms of the increased value of the website to potential purchaser(s) of the website had there been no shut down, would be unknown and immeasurable. [*Id.* ¶ 41.]

Finally, if, by virtue of some extra-judicial action taken by Knoll, he were barred from selling the IBIZA products, he could not justify continuing this lawsuit, which has already cost more than $50,000 in legal fees and expenses. He would be unable to protect his investments and potential returns on investment by fighting for a judicial victory on the merits. (*Id.* ¶¶ 44-49; c*f.* n. 2 *supra*.)

D. Defendants Seek Modest Relief. Defendants' request for the Court's assistance is extremely modest. Defendants are *not* asking for any merits-related relief. Nor are Defendants even asking the Court to order Knoll not to take extra-judicial actions. Defendants are only asking for advance notice of any imminent extra-judicial attack by Knoll or some third party acting for or at the instance of Knoll. The simple purpose of the notice would be to ensure that this case is not mooted before the Court has any chance to decide whether the extra-judicial actions should be allowed. The requested injunction will have dual benefits—to protect

Defendants from irreparable harm, and to secure this Court from a sudden forfeiture of jurisdiction, in both cases without prior notice.[6]

E. *Alphaville* Is An Important Precedent. Perhaps the most directly apposite authority as to the propriety of injunctive relief here is the action taken by Judge Patel in the *Alphaville* case. *Alphaville Design, Inc. v Knoll, Inc.,* C 07 -5569 (N.D. Cal. 2008).

We have quoted at length from the hearing transcript in our opening brief (Def. Mem. at 7-9.). In that case, Knoll had allegedly launched an extra-judicial attack on Alphaville by instigating the Customs Service to detain and seize shipments. Knoll's effort, in its brief to this Court, to minimize and re-characterize what happened in that case is unavailing. (Pl. Opp. at 9.) It is clear from reading the transcript that there was never a question as to Judge Patel's jurisdiction to halt such a threat to the litigation she was administering. It likewise is clear that Judge Patel demanded that these activities by Knoll had to stop. The irreparable injury to all concerned—the defendant and the Court—was palpable and unquestionable. Knoll knew it had no choice but to agree in open court that it would cease and desist from "fomenting" or otherwise inciting Customs to interfere with her litigation.

The situation here is precisely the same. There is no reason Knoll cannot make the same commitment in this case as it made in *Alphaville*; and if it refuses to do so, the Court would be more than justified in issuing the "notice injunction" Defendants seek (which is narrower in scope than what Judge Patel demanded of Knoll in *Alphaville*).

---

[6] Knoll argues that it has an "unfettered" right to use any extra-judicial actions available to enforce its trademarks. (PL. Opp. at 7.) Knoll is wrong. A fundamental predicate for the ancillary jurisdiction doctrine is that courts may at times need to enjoin actions that are not necessarily illegal but that nonetheless unduly threaten the courts' jurisdiction. *See* authorities cited and discussed *supra*. Indeed, in *B. & R. Choiniere Ltee. v. Art's-Way Mfg. Co.,* 1979, U.S. Dist. LEXIS 9031 (N.D.N.Y. 1979), a trademark case, Knoll's current law firm sought and obtained an order directly restraining the Customs Service from detaining allegedly infringing shipments, in order to preserve the *status quo.*

F. Knoll's Statement of Its "Present Intention" Is Not Good Enough. Knoll seems not to recognize the difference between filing complaints with Internet Service Providers ("ISP") or Customs, in the normal course of events, on the one hand, and doing so in the midst of a litigation with the specific intent of nullifying a court's jurisdiction in a case it commenced, on the other hand.

Knoll admits that it has already, once before *while this case was pendin*g, attempted in September 2011 to incite Regencyshop.com's ISP into shutting down Regencyshop.com *in its entirety* without any advance notice to Defendants. (Misthal Decl. ¶ 7.) Knoll, however, decking itself out in its finest sheep's clothing for purposes of this motion, remonstrates that, on February 9th, it verbally assured Defendants' counsel that it has no *present intention* of making another such request. It reiterated this position in its Opposition Brief. [7]

We respectfully submit that Knoll's belated, self-serving and expressly conditional (*present* intention) assurances are wholly insufficient as a substitute for the notice order Defendants seek.

Knoll showed its true predatory nature not only when it tried, without notice, to take down Regencyshop in its entirety in September 2011, but when on February 8, 2012, it cut the jugular of elegancecode.com in a single day with a single letter sent by email and without the slightest notice.

It is the pregnant, and far too ambiguous, words--"***present***" or "***current***" intention--coupled with Knoll's devastating Blitzkrieg attack on elegancecode.com just a few days ago—an

---

7 See Katsh Decl. ¶ 13 & Exh. D (February 9 email to Misthal ("I am glad, at least, that no effort is being made in regard to regencyshop); Misthal Decl. ¶ 39 ("I told him [Katsh] that I was unaware of any current efforts directed toward the take down of that website [Regencyshop.com]"); Pl. Opp. at 3 ("Knoll's counsel even advised Defendants' counsel that they were not aware of any current efforts along those lines [to take down Regencyshop.com").

attack which, per Knoll's explicit demand (Katsh Decl. Exh. C), immediately shut down the entire website (including non-IBIZA products as well)-- that more than justifies an order requiring advance notice in the event "present" or "current" intention[s]" change (which could be as soon as tomorrow, should this motion be denied).

III. Knoll's Defense of Its Actions In Using Confidential Information Is Not the Issue On the Motion

Knoll argues at great length that it did not improperly use Defendants' confidential information. However, the facts relating to this issue were presented by Defendants in their opening papers not for the purpose of seeking sanctions, but rather to provide context to the crisis Defendants suddenly confronted on February 9th when, three days after producing confidential information relating to elegancecode.com, they learned that the website.com had been summarily shut down at Knoll's instance (by letter to the ISP of February 8th) without any notice. If this could be done to elegancecode.com, it could be done to Regencyshop.com, an action that would directly threaten Defendants' livelihood.

The improper use of Defendants' confidential information gave color to the inexplicable and seemingly malicious nature (in our minds) of what Knoll had done. For despite the multiple pages they devote to a subject as to which no relief is being requested from the Court, the fact remains that Knoll cannot deny that (i) as is conventional in litigation prior to entry of a protective order, Defendants' document production was given to Knoll's counsel subject to an "outside counsel only" restriction (Katsh Decl. Exh.B), and (ii) information from certain of these documents was disclosed to Knoll and used for the non-litigation purpose of writing the letter to GODaddy seeking and obtaining a shutdown of elegancecode. These are the facts. Other than to confuse the issue, we are mystified by Knoll's spending pages upon pages to discuss draft

protective orders and other issues that do not address these facts.[8]

Again, Knoll's preoccupation with defending its actions on confidentiality should not obscure the narrow issue before this Court. This application raises the sole, very simple, and absolutely critical issue of Defendants' need for an order ensuring that they will at least receive some notice before Knoll launches some new extra-judicial attack aimed at mooting this lawsuit and in the process inflicting irreparable injury on Defendants.

CONCLUSION

Defendants respectfully request that this application be granted and that the Proposed Order be entered as a preliminary injunction.

Dated: February 21, 2012

/s/______________________

Salem M. Katsh, Esq.
Katsh & Associates LLC
64 Main Street
Hastings on Hudson, NY
914 231 7840 (T)

---

[8]To break down these facts further, we would note the following: ***First***, it is indisputable that Defendants physically marked the documents as confidential. (Katsh Decl. Exh. B.) ***Second***, all of the documents were produced under cover a letter from Defendants' counsel (conventional in discovery) which stated that, because a protective order had not yet been entered, the information must, for the time being, be restricted to outside counsel only. (*Id.*) The letter stated that if Knoll did not wish to accept the documents on those terms, "we will resolve it by negotiation or by asking the Court for a ruling." (*Id.*) ***Third***, it is further undisputed that Knoll then accepted the production and never complained about the conditions imposed by Mr. Katsh's February 5th letter. ***Fourth***, it is undisputed that the information produced revealed the fact that elegancecode.com, although not a party to the lawsuit, was affiliated with Defendant Saxena, a fact Knoll did not previously know. ***Fifth,*** Knoll wrote its letter to GODaddy, demanding a shut down of elegancecode on February 8th, just three days after it received the Defendants' production containing the information on elegancecode.com.

skatsh@katshlaw.com

Robert Tilewick, Esq.
36 Putnam Green, Suite U
Greenwich, CT 06830
203 645 6829 (T)
rtilewick@msn.com

*Attorneys for Defendants*