C3cWknoC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

KNOLL, INC.,

              Plaintiff,

        v.                       11 CV 488 (AKH)

MODERNO, INC., d/b/a Regency
Shop, et al.,

              Defendants.

------------------------------x

                           New York, N.Y.
                           March 12, 2012
                           11:15 a.m.

Before:

                HON. ALVIN K. HELLERSTEIN,

                           District Judge

                    APPEARANCES

GOTTLIEB, RACKMAN & REISMAN, P.C.
    Attorneys for Plaintiff
BY:  GEORGE GOTTLIEB
    MARC P. MISTHAL

SALEM M. KATSH
ROBERT TILEWICK
    Attorneys for Defendants

C3cWknoC

1          (Case called)

2          MR. GOTTLIEB:  George Gottlieb, counsel for plaintiff.

3     And on my right is Marc Misthal, also counsel for plaintiff.

4          MR. KATSH:  Salem Katsh, counsel for Moderno.  On my

5     right is Bob Tilewick, also counsel for Moderno.

6          THE COURT:  Thank you, gentlemen.  Be seated.

7          I have two motions before me, both by defendant.  One

8     is a motion for judgment on the pleadings by defendant, mostly

9     to the effect of two of the affirmative defenses set out by the

10    defendant.  The second is a motion for injunction prompted by a

11    notice by the plaintiff to the Web host of defendant's presence

12    on the Web, which claimed infringement on the issues proposed

13    by the pleadings and sought injunctive relief with regard to

14    that.

15         Do I have the motions correct, Mr. Katsh?

16         MR. KATSH:  Yes, basically.

17         THE COURT:  Anything you need to amend on that to make

18    them correct?

19         MR. KATSH:  No, sir.

20         THE COURT:  Then I'll hear you.  Let's start with the

21    motion for judgment on the pleadings, because I think that may

22    drive other motions as well.

23         MR. KATSH:  Should I address the Court from this

24    podium, sir?

25         THE COURT:  That would be fine.

C3cWknoC

```
1            MR. KATSH:  And I also have a few charts that I'd like
2   to use to help.
3            THE COURT:  Sure.  Go ahead.
4            Have you seen them before, Mr. Gottlieb?
5            MR. KATSH:  No, your Honor.
6            THE COURT:  You can't use them, Mr. Katsh.
7            MR. KATSH:  I can't use charts?
8            THE COURT:  One would think that you would have
9   cleared it with your adversary beforehand.  Were you going to
10  surprise him with them?  Let him look at them now; I'll wait.
11  Don't do that again, Mr. Katsh.
12           MR. KATSH:  No.  I'm sorry.
13           THE COURT:  If you're going to use a demonstrative in
14  court, your adversary deserves to see it in advance.
15           MR. KATSH:  You're right.
16           MR. GOTTLIEB:  Your Honor --
17           THE COURT:  Do you object?
18           MR. KATSH:  Yes, your Honor.  We object to them.
19           THE COURT:  Sustained.
20           MR. KATSH:  Except --
21           THE COURT:  Sustained.
22           MR. KATSH:  -- there are copies.
23           THE COURT:  Objection sustained.
24           MR. KATSH:  Your Honor, let me preface my remarks by
25  saying that we obviously have been, and will continue to be,
```

C3cWknoC

1    working very hard to put forward our position that the designs

2    of this furniture are functional.

3              THE COURT:  Let me help you, Mr. Katsh.  You made a

4    motion for judgment on the pleadings.

5              MR. KATSH:  Correct.

6              THE COURT:  My inquiry does not go beyond the

7    pleadings.

8              MR. KATSH:  Correct.

9              THE COURT:  So we have your pleadings.  We have the

10   amended complaint.  We have the amended answer.  You have

11   pictures attached to both.  Let's confine our remarks to that.

12   Don't complain that you're handicapped.

13             MR. KATSH:  No, I wasn't going to.  I was going to say

14   that I have not heard from the plaintiff why they think a

15   chair, a stool, a bench, and a couch are trademarks, and it's

16   not in any of their briefs.  It's not in their complaint, and

17   I'm looking forward to hearing that today.

18             THE COURT:  You mean they should not have been able to

19   get trademarks for the appearance of a design?

20             MR. KATSH:  That's correct.  You can't get a trademark

21   for a utilitarian product of commerce.

22             THE COURT:  Is not the trademark incontestable?

23             MR. KATSH:  Incontestability, under 15 U.S.C.

24   1114(b)(9), functionality is specifically a grounds on which to

25   contest a registered mark that has become quote/unquote

C3cWknoC

1   incontestable for other purposes.

2          THE COURT:  That's your affirmative defense about

3   functionality.  It's not that they can't get the trademark.

4   The question is functionality.

5          MR. KATSH:  What I'm saying is however and whether

6   they got a trademark registration on these products, these

7   products cannot be trademarked.

8          THE COURT:  Because you're saying they're functional?

9          MR. KATSH:  That's correct.

10          THE COURT:  No chair in the world can be trademarked?

11          MR. KATSH:  No chair that is an actively sold item of

12   commerce can be trademarked.

13          THE COURT:  No matter what its appearance?

14          MR. KATSH:  Let me put it this way.  A trademark is an

15   intangible message.  I have two pens here.  One says Sharpie,

16   and one says Papermate.  Now, the producer pays to have those

17   trademarks put on these products so that if I want a Sharpie, I

18   can go to the store and look to see the trademark.  If the

19   trademark's not on this product, it's in the public domain.

20   Anybody can copy it.

21          THE COURT:  I would have thought that anyone that

22   produces something that the public associates with the source

23   of the particular item can be a trademark.

24          MR. KATSH:  No.

25          THE COURT:  If I see a chair and there's a trademark

C3cWknoC

1   on its appearance, because of its unusual appearance, I can

2   have it trademarked.  That's what I thought.  Maybe I'm wrong.

3            MR. KATSH:  I would, with respect, say if that may

4   once have been some view, it was not found by the Supreme Court

5   in its Traffix decision in 2001, where it says --

6            THE COURT:  What page?

7            MR. KATSH:  If I can just read this to your Honor.

8            THE COURT:  What page?

9            MR. KATSH:  What page on Traffix?

10            THE COURT:  Yes.

11            MR. KATSH:  34 or 35.

12            THE COURT:  Go ahead.

13            MR. KATSH:  "The Lanham Act does not protect trade

14   dress in a functional design simply because an investment has

15   been made to encourage the public to associate a particular

16   functional feature with a single manufacturer or seller."

17            THE COURT:  That's why I said it begs the question on

18   functionality.  You have to prove functionality.  You can't

19   prove it.

20            MR. KATSH:  But functionality, under Traffix, is

21   proved under the definition given in Traffix; namely, whether

22   the product feature is essential, quote/unquote, is essential

23   to the use or purpose of the product.

24            THE COURT:  That was a spring-like device that allowed

25   a traffic light to swing in the wind.

C3cWknoC

1           MR. KATSH:  That's correct.

2           THE COURT:  And the Supreme Court held that the

3    flexible item, that spring, was essential to that feature, and,

4    therefore, there couldn't be a trademark, it couldn't protect

5    that design.  It's not our case, unless you show it.

6           Let's go to the case itself.

7           MR. KATSH:  How can chair legs not be essential to the

8    chair?  They are claiming the entire product as a trademark.

9    They're not claiming a word mark.  They're not claiming trade

10   dress.  They're not claiming even a feature of the product,

11   which was the case in Traffix.  Every single court that has

12   discussed the question of functionality has discussed it in

13   terms of whether some feature of an overall product might serve

14   as a source signifier.  They are claiming the entire product,

15   and that is the problem here because, think of it, the standard

16   is whether the article is essential to its purpose, is

17   essential to the use or purpose of the alleged trademark

18   design.  If the trademark design is the whole thing, then they

19   force us to ask the question:  Is the design essential to

20   itself?  Is the Barcelona chair, for which we're claiming that

21   it's a complete, all of it is not trademarked, is it essential

22   to the use or purpose of itself.  And of course it is, and

23   that's where they've gone overbroad in not claiming features of

24   products, and there could be, and we concede, you can have, as

25   the Traffix court also said, What is nonfunctional?

C3cWknoC

1    Nonfunctional is the opposite.  It's arbitrary, some arbitrary

2    feature, some whimsical feature, some ornamental feature,

3    that's sort of like the word mark.

4              THE COURT:  So if the whimsical or the aesthetic can

5    be claimed, as to features, why can't a combination

6    constituting the whole be claimed?

7              MR. KATSH:  Because you first have to ask whether the

8    product is or isn't functional.  If it meets the test of

9    essential to the use or purpose of the product.  If you

10   conclude that it is essential to the use or purpose of the

11   product, it goes into the public domain, and nothing can take

12   it back into the realm of trademark.  Not if it has secondary

13   meeting.  The Traffix court explicitly said secondary meeting

14   we don't look at if it's functional.  We don't look at

15   association if it's functional.

16             THE COURT:  What happens if you have some object which

17   can perform a function but where every constituent part is

18   whimsical or aesthetic, not controlled by function but

19   something else, you can't get trademark for the product?

20             MR. KATSH:  I'm sorry?

21             THE COURT:  That's not possible?

22             MR. KATSH:  Can your Honor give that to me again?  I'm

23   sorry.

24             THE COURT:  Suppose you have a product that would be

25   essential to each of which is aesthetic in its design, although

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C3cWknoC

the chair can perform or the product can perform a function,

here to enable a person to sit down and rest, nevertheless,

every constituent part is a product of whimsy or aesthetics.

MR. KATSH:  I understand.

THE COURT:  If you can trademark every feature, why

can't you trademark the combination of those?

MR. KATSH:  I don't know if they could have

trademarked the pillow or the top of the table, but the Traffix

court again said that the availability of alternative design,

the fact that somebody has spent a year picking a set of

features and put them together is irrelevant once you've

decided that it's functional.  What I'm saying is an entire

table --

THE COURT:  Let's look at the chair, which is the

basic one.  It's trademark registration No. 2893025.  It's been

used in commerce since January 1, 1954.  The trademark itself

was issued October 22, 2003.  It's been in existence therefore

as a trademark.  It was registered October 12, 2004.  So it's

been in existence for what, seven and a half years,

approximately?

MR. KATSH:  Actually, 90 years, it was first made for

the king and queen of Spain at the 1929 exhibition in

Barcelona.  That's why it's called the Barcelona chair.

THE COURT:  By Mies van der Rohe.

MR. KATSH:  Yes, sir.

C3cWknoC

1          Then over time it became more and more popular and

2     lots and lots of different companies starting making them and

3     selling them.  Knoll did get a registration in 2004, and the

4     question is whether it's functional.  It's functional if the

5     registration dies.  If you look at the picture, if you look at

6     the registration --

7          THE COURT:  I'm looking at the chair in the picture.

8          MR. KATSH:  Okay.

9          THE COURT:  It's an oversized chair, the seat of which

10    is tilted somewhat to the back with a tilted sort of convex

11    back, made up of tufted leather, the spine and legs of which

12    show a gentle arc starting from the top and going to the bottom

13    and a counter-arc the other way, each part of which is, to me,

14    primarily aesthetic although the overall chair performs the

15    function of allowing the person to sit and rest.  The manner of

16    the chair and the design of the chair and the look of the chair

17    and the feel of the chair is subjective, aesthetic, unlike any

18    other.

19         That's how I would describe it.  Would you like to

20    describe it a different way?

21         MR. KATSH:  Absolutely.

22         THE COURT:  Go ahead.

23         MR. KATSH:  It is unlike other chairs.  Every single

24    chair could be described as your Honor has described this

25    chair.  Every single chair has its own particular shapes,

C3cWknoC

slopes, and whatever.  Every single item.  Those lamps are very

distinctive, right up there.  Just because something has an

aesthetic quality to it doesn't mean that it's not a

utilitarian article of commerce.  The chair in its essence is

for people to sit on.  The table, if you look at the table, the

table has nothing except a top and four legs, and they're

claiming that can be a trademark.

Justice Holmes, in 1901, in the famous flag

manufacturing case, he was dealing with a zephyr, it was an

old, kind of guitar-type instrument, and it was out of patent.

The defendant copied it down to every single nook and cranny,

and Holmes said, That's fine, you're allowed to do that.

Copying is good.

As Justice O'Connor said in Bonito Boats, copying is

the lifeblood of a competitive economy, and in the public

domain, we channel all of the products that are made by people

in commerce.  If they can get a patent, that's fine, but if

they can't or the patent expires, it belongs to the people to

copy.  And maybe they could have gotten trademark on what you

called the tuft in the cushion or the slope of the back; they

didn't.  They went for a trademark on the entire piece of

furniture.  This is furniture.  I mean, sure, it's got to be

aesthetic for people to want to look at it.  But the first

thing they are going to want to know is can they sit on it and

can they eat on it, so it has to be functional.

C3cWknoC

1          If you look at Traffix, Traffix was insistent that the

2     determination of functionality be made first.  There was a

3     so-called competitive necessity doctrine before Traffix.  It

4     was in dispute in the lower courts, and many courts were

5     saying, Well, if you show me a product design and the defendant

6     could come up with alternatives so he could compete with the

7     trademarked product, then the trademarked product is

8     nonfunctional because the defendant can't prove that he has to

9     have it; he doesn't have a need to copy.

10         The Traffix court threw that out and said there is no

11    competitive necessity defense.  When you read their opposition

12    brief, you'll find that the primary argument they're making is

13    that people are still free to sell furniture and that they

14    haven't prevented people from selling furniture, and that's the

15    competitive necessity test, and that's no longer good law.  And

16    it's interesting, the person making the oral argument in

17    Supreme Court for Traffix was none other than Justice Roberts.

18    I don't have that to hand out.  I certainly haven't cleared it

19    in advance with counsel, but if your clerk is interested in the

20    very interesting debate on this whole subject --

21         THE COURT:  It's I who needs to be interested.

22         MR. KATSH:  And your Honor, yes.

23         It's a fascinating discussion, at the precipice, where

24    the trademark law was clarified by this decision in Traffix,

25    and I don't think they have gotten around it.  They haven't

C3cWknoC

1    even claimed anything nonfunctional about the chair, the table,

2    the couch.  What is it that could be a trademark?  And

3    remember, a trademark is a message.  It's an intangible.  You

4    don't buy a trademark good in commerce.  You don't go to the

5    store and say I'd like to buy the trademark Wonder Bread.  The

6    producer pays to put the trademark on his product so as to send

7    a signal, an intangible signal to consumers, so when I go down

8    the row of breads and there are all these different brands and

9    they're all screaming, Buy me, buy me, I can pick out Wonder

10   Bread because it has a trademark.  It's an intangible message.

11          Now, it's possible that a product design could be so

12   static and so nonutilititarian that it could somehow be

13   communicating a message --

14          THE COURT:  I'd like to draw a distinction of law

15   rather than rhetoric.  The United States Supreme Court in

16   Traffix defined functionality this way:  "A product feature is

17   functional and cannot serve as a trademark if it is essential

18   to the use or purpose of the article or if it affects the cost

19   or quality of the article."

20          Now, in looking at the Barcelona chair, do this with

21   each one of the items making up the Barcelona collection,

22   although there is a seat, this can't be described as a seat

23   that is essential to be used for the purpose of the article,

24   and the same goes for the legs and the same goes for the back.

25   And the same goes for the nature of the material and its tufted

C3cWknoC

1    quality.

2              Who has the burden, incidentally?

3              MR. KATSH:  You're suggesting --

4              THE COURT:  Who has the burden to prove functionality?

5    It's you, isn't it?

6              MR. KATSH:  Yes, sir.

7              THE COURT:  So it's your burden.

8              MR. KATSH:  It is.  And what I'd like to point out is

9    that what you read there, if you look at it, is talking about a

10   feature of a product.

11             THE COURT:  Traffix deals with a feature, which is the

12   dual spring design.

13             MR. KATSH:  All the cases deal with features.

14             THE COURT:  You've made your point.  Let me hear what

15   Mr. Gottlieb has to say.  Then we'll go into each product.

16             MR. GOTTLIEB:  Your Honor.

17             THE COURT:  Why don't you take the podium.

18             MR. GOTTLIEB:  I'm sorry?

19             THE COURT:  Why don't you take the podium.

20             MR. GOTTLIEB:  I'm sorry, your Honor.  Thank you.

21             Your Honor, counsel for the defendant, at page three

22   of its main brief, makes the following statement:  "These

23   decisions establish that the configuration of a utilitarian

24   product such as an item of furniture is functional, is in the

25   public domain, and may not be trademarked and thereby

C3cWknoC

1    monopolized for an indefinite period of time."  And there he

2    refers to the Traffix case and the Wal-Mart case.

3           Your Honor, that statement by opposing counsel is

4    completely contrary to law.  The Traffix case, as you have

5    noted, is a case where the Supreme Court dealt with the

6    question of functionality in the context of a patent, and the

7    Supreme Court said --

8           THE COURT:  A patent that had expired.

9           MR. GOTTLIEB:  Correct.

10          The Supreme Court said that a patent, expired or even

11   in force, is a very strong indication of functionality.  So No.

12   1, we're dealing there with an unregistered trademark, your

13   Honor, which is a tremendous difference.

14          THE COURT:  The point I'm interested in is the

15   argument that there is no case that assigns a trademark quality

16   to an entire product.

17          MR. GOTTLIEB:  Right.  And no case that I have ever

18   read, your Honor, makes such a statement.  In fact, your

19   Honor --

20          THE COURT:  That's not what he said.  He said there's

21   no case that deals with such.

22          MR. GOTTLIEB:  There is a case, your Honor, and I

23   cited that in our brief.  The case of Moen v. Kohler, a Seventh

24   Circuit case, is a very interesting case, your Honor, because

25   it's very parallel to this case before your Honor.  In fact, if

C3cWknoC

```
1    that were a decision by the Second Circuit, it would be a

2    hundred percent binding.  So what happened in that case, your

3    Honor, is that Moen is a manufacturer of faucets and it

4    obtained registrations for its faucets from the patent office.

5             Your Honor, may I hand up to you and opposing counsel

6    copies of the registrations that were the subject of that case.

7             THE COURT:  I have a motion for judgment on the

8    pleadings.

9             MR. GOTTLIEB:  I think it was motions for summary

10   judgment, your Honor.

11            THE COURT:  Before me are a motion for judgment on the

12   pleadings and a motion for injunction.

13            MR. GOTTLIEB:  Right.  I'm just saying, your Honor,

14   that case states --

15            THE COURT:  I'm exercising my discretion not to

16   enlarge the record.

17            MR. GOTTLIEB:  Your Honor, what I'm saying is that I

18   know the case law, I believe, very well, and no case has ever

19   held that once the patent office issues a trademark

20   registration, which itself is a very long and detailed

21   process --

22            THE COURT:  Mr. Gottlieb, that's not his argument.

23   What were the facts in Moen?

24            MR. GOTTLIEB:  The plumbing manufacturer got two

25   registrations from the patent office and we have those, if your
```

C3cWknoC

1    Honor would like to see them.

2              THE COURT:  Mr. Gottlieb, please proceed.

3              MR. GOTTLIEB:  The opposing party, Kohler, also a

4    plumbing manufacturer, opposed those registrations in the

5    trademark trial and appeal board on the theory that it was

6    improper for the trademark office to issue product

7    configuration registrations.  The trademark trial and appeal

8    board sided with Moen and upheld the registrations.  The case

9    that went into the District Court.  The District Court again

10   upheld the validity of the registrations on the basis that the

11   trademark act, the Lanham Act, permits registrations of product

12   configurations.  And they went up to the Seventh Circuit, and

13   the Seventh Circuit, in upholding the theory, or those

14   registrations held there's no inconsistency between the patent

15   laws and the practice of the trademark office issuing product

16   registrations.  They said that patents have a certain purpose,

17   certain considerations for the public, and basically patents

18   are limited time monopolies.  On the other hand, trademarks are

19   focused on preventing confusion, and the Seventh Circuit held

20   that there's nothing inconsistent between --

21             THE COURT:  What happened there, Moen came out with a

22   certain type of spigot?

23             MR. GOTTLIEB:  Right, exactly.

24             THE COURT:  And Kohler copied the spigot?

25             MR. GOTTLIEB:  Right.

C3cWknoC

| 1 | THE COURT:  And did Moen have a trademark |
| 2 | registration? |
| 3 | MR. GOTTLIEB:  Exactly. |
| 4 | THE COURT::  For the look of the spigot? |
| 5 | MR. GOTTLIEB:  Yes, the did, your Honor. |
| 6 | THE COURT::  And the Seventh Circuit upheld the |
| 7 | trademark registration? |
| 8 | MR. GOTTLIEB:  Right, basically saying there's no |
| 9 | inconsistency. |
| 10 | THE COURT:  How did that come up, on a summary |
| 11 | judgment? |
| 12 | MR. GOTTLIEB:  I believe it came up on summary |
| 13 | judgment, your Honor, yes. |
| 14 | THE COURT:  The Seventh Circuit said you can look at |
| 15 | the nature of the spigot, make a determination whether it's |
| 16 | functional or not, and if it's not, uphold the registration as |
| 17 | to the entire product? |
| 18 | MR. GOTTLIEB:  They didn't exactly say it that way, |
| 19 | your Honor, because remember -- |
| 20 | THE COURT:  I don't have it. |
| 21 | MR. GOTTLIEB:  -- Moen had to prove nonfunctionality |
| 22 | in getting its registration.  Then, now, the burden shifts to |
| 23 | the opposing party, so they're basically saying that they met |
| 24 | their burden of showing nonfunctionality in the first instance. |
| 25 | THE COURT:  This was a motion to cancel the trademark |

C3cWknoC

1    registration?

2           MR. GOTTLIEB:  Right.  Exactly, because you have the

3    right, your Honor, after the patent office issues --

4           THE COURT:  I take your point.

5           Let me ask Mr. Katsh.  What is your gloss on that

6    case?

7           MR. KATSH:  I think that was a case where it was an

8    appeal from a decision by the trademark board, and there were,

9    I think, different burdens because of that.  But, to your

10   point, the spigot was part of a larger assembly.  And I don't

11   think that case said or dealt with the issues right before your

12   Honor whether you can get a trademark on an entire integrated

13   product.

14          Having said that, I did not say to you, I don't

15   believe, that there's no case in which it was held that you

16   couldn't get a trademark on an entire product.

17          THE COURT:  I'm glad you told me that because I

18   thought you had said something different.

19          MR. KATSH:  No, I didn't say that.  I'm saying that

20   under Traffix, that would be impermissible.

21          THE COURT:  I don't read Traffix the way you do.  I'm

22   sorry.

23          Please continue, Mr. Gottlieb.

24          MR. GOTTLIEB:  Again, your Honor, I'd like to go back

25   to the most basic issue, which is this is a motion on the

C3cWknoC

```
 1   pleadings, not a motion for summary judgment.  It's not a

 2   motion on the issue of functionality.

 3            THE COURT:  I was going to ask you, if I decide that

 4   you can get a trademark because this is a trademark on

 5   aesthetics and appearance rather than function, can I strike

 6   the defense at this point in time?  Or do I need to wait?

 7            MR. GOTTLIEB:  You absolutely can strike it, your

 8   Honor.

 9            If I can go a little bit afield --

10            THE COURT:  Maybe you don't want to make the next

11   point you were going to make.

12            MR. GOTTLIEB:  May I, just for the record, your Honor,

13   hand you the registrations in this case we've been talking

14   about.

15            THE COURT:  Which one?

16            MR. GOTTLIEB:  The Moen v. Kohler case.

17            THE COURT:  No.

18            MR. GOTTLIEB:  So my first point again, your Honor, is

19   this is a motion on the pleadings.

20            THE COURT:  I think I've got your point and I've got

21   Mr. Katsh's point with regard to the chair.

22            Exhibit B to the amended complaint deals with a stool,

23   and I think it's really covered by the same point, unless Mr.

24   Katsh has some additional argument with regard to the stool.

25            Do you agree, Mr. Katsh?
```

C3cWknoC

<pre>
 1              MR. KATSH:  No additional argument, no.

 2              MR. GOTTLIEB:  I just have one other point, if I

 3     might, your Honor, on the motion.

 4              THE COURT:  Yes.

 5              MR. GOTTLIEB:  Which is on the disclaimer issue, as

 6     part of the motion on the pleadings --

 7              THE COURT:  I would like to hear Mr. Katsh first on

 8     that.  Hold that.  I'm just looking now at functionality,

 9     Mr. Gottlieb.

10              MR. GOTTLIEB:  I have nothing else, your Honor, on

11     that point.

12              THE COURT:  So the stool is covered by the same

13     criteria.

14              Exhibit C is a bench.  According to the picture in the

15     amended complaint, this is a bench with the same kind of tufted

16     presumably leather composition material that provides the flat

17     surface of the bench.  There's a roll at the end which serves

18     the function of a pillow, though it would be a different pillow

19     from anything else.  I can't really see, and, Mr. Gottlieb,

20     maybe you can describe the legs.  There seem to be four metal

21     legs, short legs, but not at the corners.

22              Can you describe that?

23              MR. GOTTLIEB:  Just give me one minute, your Honor.

24              THE COURT:  If you have an actual picture, that might

25     be useful.
</pre>

C3cWknoC

| | |
|---|---|
| 1 | MR. GOTTLIEB:  Right.  This has four vertical legs, |
| 2 | your Honor, a flat tufted -- |
| 3 | THE COURT:  I described the rest.  I'm just interested |
| 4 | in the legs.  They're not at the corners. |
| 5 | MR. GOTTLIEB:  No.  They're a little bit in from the |
| 6 | corners. |
| 7 | THE COURT:  They're off from the corners. |
| 8 | MR. GOTTLIEB:  Right. |
| 9 | THE COURT:  Are they flush from the side or indented? |
| 10 | MR. GOTTLIEB:  I believe they're inside a little bit, |
| 11 | your Honor, but I'm not a hundred percent sure. |
| 12 | THE COURT:  Is there any particular argument regarding |
| 13 | functionality, Mr. Katsh, with regard to this bench?  What |
| 14 | would you call it, bench or bed, a couch? |
| 15 | MR. GOTTLIEB:  Couch. |
| 16 | THE COURT:  A couch.  A backless couch. |
| 17 | Anything else you want to say about this, Mr. Katsh? |
| 18 | MR. KATSH:  Not at this exact moment. |
| 19 | THE COURT:  And Exhibit D is a table.  Now, I don't |
| 20 | think you've been making those products, have you, Mr. Katsh? |
| 21 | Have your clients been making a table or a couch? |
| 22 | MR. KATSH:  I believe they have. |
| 23 | THE COURT:  They have, so I need to go into that. |
| 24 | The table appears to be a glass square, though I'm not |
| 25 | sure, raised from the floor by four crossed legs, each |

C3cWknoC

1    describing a diagonal intersecting at the center.  But the legs

2    do not reach the ends.  They are short of the ends a certain

3    distance, probably equal for each leg, supporting the table

4    that way.  All of these were registered October 2004.

5              Those are the four items that constitute the Barcelona

6    collection, and these are the four items in suit.

7              There's another item, Exhibit E.

8              MR. KATSH:  We don't think that --

9              THE COURT:  So Exhibit E is not an issue and I need

10   not go into it.

11             All right.  Let me make a ruling on functionality.

12             MR. KATSH:  Your Honor.

13             THE COURT:  Yes.

14             MR. KATSH:  May it please the Court if I could have

15   two more minutes on it.

16             THE COURT:  Yes, you may.

17             MR. KATSH:  Your Honor's described these products as

18   embodying aesthetic features as well as functional features,

19   and I was sitting here and I was thinking how to best put

20   forward why I think that the product has to be viewed first and

21   foremost as functional, and I was thinking that if we just

22   bought a house and we looked at a lot of houses and we

23   certainly wanted a house that was aesthetically beautiful, but

24   the first and foremost thing it had to have was plumbing and

25   all the other things that make a house work.  And that's what

C3cWknoC

```
1   we have here.  The Barcelona chair could be very beautiful, but

2   it first and foremost has to let a person sit on it.

3            As I read Traffix, not only as I read Traffix, that is

4   the essential aspect of the chair.  So if they want to

5   trademark an entire product, that entire product is essential

6   to itself and would be functional under Traffix.

7            One final point, I think you can rule in our favor on

8   this motion.  I would respectfully say that you should not rule

9   against us because this is a motion on the pleadings where

10  entirely limited to the face of these trademarks on discovery

11  and trial or summary judgment, it would be a lot more facts.

12           THE COURT:  What facts would be relevant?

13           MR. KATSH:  First of all, in light of today's hearing,

14  I certainly would go into the question of aesthetic versus

15  actually utilitarian.

16           THE COURT::  Why would that be a subject for anyone

17  else?  What could you bring in on that subject, an expert that

18  explains the ruling on the law?

19           MR. KATSH:  It's mixed.  I think an expert could be

20  brought in to look at the range of products.

21           Are we saying that they can trademark a house?

22           THE COURT::  I don't have a house before me.  I don't

23  need to decide that.

24           MR. KATSH:  But the principle is the same.  I just

25  think that they did not cross-move.  We would approach the
```

C3cWknoC

1     issue in an obviously more elaborate way on summary judgment

2     than we have on a motion for the pleadings where we've attacked

3     the pictures.

4                 THE COURT:  I'll save you a little bit of effort, Mr.

5     Katsh.  I have not thought hard enough or long enough about

6     this issue to feel I am confident in deciding on the merits

7     whether this product serves or doesn't deserve the trademark.

8     I've thought enough to know that I will not grant your motion.

9     I've thought enough to feel that it's likely that there can be

10    a registration of an entire product by its aesthetic look.

11                What bothers me is not the facts that you would bring

12    up or an expert, which I'm not sure is relevant to this issue,

13    but the extent of my rulings.  Suppose someone would copy the

14    chair as your client seems to have done with selling the

15    replica.  Would that act be a violation that would make it a

16    patent rather than a trademark?

17                MR. KATSH:  That is our point.

18                THE COURT:  I understand, but it's not really your

19    point because what your client has done is set up a replica to

20    compete with Knoll and, in fact, tell people you can buy this,

21    because it has all the look of a Mies van der Rohe chair,

22    without being a Mies van der Rohe price.  Different.  I'm just

23    saying I haven't thought about it enough.  I am not going to

24    strike your defense, but I will deny your motion.

25                MR. KATSH:  Can I address the disclaimer issue?

C3cWknoC

```
 1          THE COURT:  I will do that in a minute, as soon as I
 2    finish with this.
 3          The motion for judgment on the pleadings based on the
 4    second and third affirmative defenses is denied.  Affirmative
 5    defense No. 2 is as follows:  "The designs that Knoll seeks to
 6    enforce as trademarks are functional and unpatented and the
 7    public may not be prevented from clearly copying and using
 8    them."  That motion is denied.
 9          Third, the amended complaint fails to allege or
10    specify any nonfunctional aspects of the allegedly trademarked
11    protective designs and/or insufficiently does so.  That's
12    denied because it's evident in the pictures that are attached,
13    among other things.
14          Let's go on to disclaimer.
15          Go ahead, Mr. Katsh.
16          MR. KATSH:  Your Honor, a very simple point.
17          My clients have gone the extra mile to make sure, as
18    Mr. Gottlieb pointed out, there could be no likelihood of
19    confusion with respect to what they're selling and with respect
20    to people who want to buy the Knoll chair.
21          THE COURT:  Let's suppose I say that a person who buys
22    this chair from you is not fooled.  I'm not saying it, but
23    let's suppose I'm saying it.  And he brings it into his home.
24    What's the rule then when some visitor comes to the home and
25    says, Oh, you have this beautiful Mies van der Rohe chair, and
```

C3cWknoC

1    the host is silent?

2              MR. KATSH:  I would say that anybody who would know

3    what a Mies van der Rohe chair is would immediately look at the

4    frame to check if it had the engraved signature of Mies van der

5    Rohe.

6              THE COURT:  That's rather gauche, isn't it?

7              MR. KATSH:  Well, anybody --

8              THE COURT:  Are you saying someone looking at a Mies

9    van der Rohe chair would say, Let me look at this particular

10   chair under a microscope.  Do you have a magnifying glass?  I

11   want to see if there is a signature on it by Mies van der Rohe.

12   Oh, there's no signature, you're fooling me.  You don't have a

13   Mies van der Rohe chair.  You have a cheap copy.

14             MR. KATSH:  You don't think that a person who is aware

15   of this furniture knows that there are dozens and dozens of Web

16   sites selling replicas.

17             THE COURT:  What happens if I'm the visitor?  I don't

18   know about these things.

19             MR. KATSH:  Suppose you sit down, you're a visitor

20   coming and sitting down at the breakfast table, and right in

21   front of your nephew, or whatever, is a big bowl of Shredded

22   Wheat and it's moldy and it's awful.  Okay, you say, I'm never

23   going to buy NaBisCo again.  This argument can be taken to an

24   extreme.

25             THE COURT:  I'm looking at the Hermes International v.

C3cWknoC

1    Lederer de Paris, 219 F.3d 104, 108 (2d Cir. 2000), which holds

2    that "postsale confusion can occur when a manufacturer of

3    knock-off goods offers consumers a cheap knock-off copy of the

4    original manufacturer's more expensive product, thus allowing

5    the buyer to acquire the prestige of owning what appears to be

6    the more expensive product."

7             That's indeed what you advertise, right.

8             MR. KATSH:  What I'm saying is that, first of all,

9    they haven't alleged postsale confusion.  I don't know if they

10   can.  They're not losing goodwill on account of our product

11   being sold.  If it made them happy, we've gone the extra mile,

12   we'll stamp the chair Ibiza.  We have no interest in fooling

13   anyone, as our Web site shows.  The likelihood that somebody is

14   going to visit somebody's home and just happen to stumble on

15   our chair when there are 2,000 other fake chairs in the city is

16   just not within the scope of, it's just too speculative to take

17   away from us the credit we deserve for that disclaimer.  I

18   mean, we are making sure, unlike so many other Web sites that

19   actually infringe the trade word Barcelona, and so many other

20   Web sites, we have gone that step to disclaim, and your Honor

21   has himself, in I think the bagel case, as we call it --

22            THE COURT:  Don't cite the bagel case.  It's not very

23   useful here.

24            MR. KATSH:  All right.

25            THE COURT:  And on another issue of disclaimer, the

C3cWknoC

1    Second Circuit reversed me.

2          MR. KATSH:  I know that, and the Second Circuit has

3    gone back and forth.

4          THE COURT:  I'll give you an anecdote about that case.

5          MR. KATSH:  Okay.

6          THE COURT:  I got the two people in on a conference

7    and I observed that there wasn't enough money in their business

8    or in the case to warrant a big deal trademark infringement, so

9    you should settle.  They heartily agreed and then I discussed

10   settlement and neither side was interested, and I suggested the

11   idea of disclaimer on both and they pointed out all the

12   deficiencies about disclaimers, and I agreed with them.  So I

13   said, What do you want to do.  They said, We'd like to settle.

14   I said, The only way you're going to settle is by disclaimer,

15   and so I offered disclaimer.  One of them took it up, they won,

16   which was easily anticipated.

17         I said:  Okay.  You're back, folks.  Congratulations

18   on winning.  What would you like to do with the case?  We'd

19   like to settle, your Honor.  I said, Get out of here.  I never

20   heard from the case again.

21         MR. KATSH:  I've been doing this for 39 years.  I

22   would stake my reputation that no one reading that disclaimer

23   that we have could possibly think we are associated with Knoll

24   in any way, shape, or form.  And we stand out in that regard

25   from dozens and dozens of other Web sites which are exhibits to

C3cWknoC

1    our amended answer, which, frankly, I don't think is right that

2    they're marketing in this way.  But we are being responsible,

3    and if there's anything else they want us to do, we'll do it.

4              THE COURT:  There are two forms of disclaimer that

5    have been attached to the answer.  One is a very difficult one

6    to see, but the defendant has said that that was the wrong

7    disclaimer, it's been changed to one that's more visible.  So

8    I'm going to assume that the more visible disclaimer as set out

9    in Exhibit B is the one in use.

10             MR. KATSH:  That's correct.

11             THE COURT:  The other one is just impossible to read.

12             MR. KATSH:  The other one was before, frankly, he got

13   advice of counsel and I sat with him and we created what I felt

14   was a bomb-proof disclaimer.

15             THE COURT:  So here it says, "Our Ibiza chair is a

16   replica of a chair designed in 1929 by Mies van der Rohe, often

17   referred to as the Barcelona chair.  Knoll, Inc. produces and

18   sells the authentic Barcelona chair, with the engraved

19   signature of Mies van der Rohe and a certificate of

20   authenticity at prices in the thousands of dollars, many times

21   higher than the price of our Ibiza chair.  Our replica of he

22   Barcelona chair is intended for consumers who wish to purchase

23   a reproduction of a chair of historic design and at an

24   affordable price," and it goes on to disclaim the affiliation

25   with Knoll, and the like.

C3cWknoC

1          What it does here is to say, Look, folks you can buy

2     our chair.  It's a replica.  It's not a licensed replica, it

3     doesn't say anything about that, but it's a replica, which

4     means that anybody coming into your house will say, Oh, wow,

5     this is just exactly like a Knoll chair.  And I say, How much?

6     Hundreds, maybe more, of dollars, that was exactly what was

7     held illegal by the Second Circuit.

8          I deny your motion with regard to the disclaimer.

9     Indeed, I go beyond that because here I'm sure this disclaimer

10    is of no legal effect whatever, and I strike it.  So this deals

11    with the following affirmative defenses:

12         No. 4, "defendants have inserted disclaimers into

13    relevant pages of RegencyShop.com that render it impossible for

14    any rational consumer to be misled or confused or likely to be

15    misled or confused into thinking that defendant's product sold

16    under their Ibiza's trademark could come from Knoll or that

17    defendants had any other affiliation or any other business

18    arrangement with Knoll."

19         Striking that defense, I'll save you both lots and

20    lots of money getting tangential surveys.

21         MR. KATSH:  Your Honor, would it be possible for your

22    Honor to strike it with respect to postsale issue and not with

23    respect to somebody at the point of sale?

24         THE COURT:  No.  No.  I'm not sure you folks have an

25    address.  I know that Mr. Gottlieb had problems serving you.  I

C3cWknoC

1      had to give him a special order.

2                  MR. KATSH:  Moderno was right where they have always

3      been on Gardenia Street outside Los Angeles.  I wasn't involved

4      then, and I don't know what his problem was.  But we certainly

5      have an address.

6                  THE COURT:  You do have an address.  No, I'm not going

7      to do that, though, because it's the same issue.

8                  Now, your motion for preliminary injunction.

9                  MR. KATSH:  My colleague, Mr. Tilewick, will be

10     handling that.

11                 MR. TILEWICK:  Good morning, your Honor.  My name is

12     Bob Tilewick.  I'm representing the defendants on this motion.

13                 This motion was originally brought on, as you're

14     likely aware, on an order to show cause on notice and the

15     urgency for the need for relief then wasn't as urgent as it is

16     now.  What we were trying to do is nothing less than protect

17     the defendants' solvency and the defendants' ability to

18     continue to engage in business while this litigation is

19     pending.  The sole request that we're asking for is notice

20     before plaintiff Knoll engages in any further self-help or

21     extra-judicial activity designed to bring down the defendants.

22                 We, to date, are aware at least of their attempt to

23     bring down one of the two Web sites that defendants own.  In

24     this case it was Augustco.com, according to Mr. Misthal's

25     affidavit, it also had contact with Customs, and these are

C3cWknoC

various activities which I'm referring to as extra-judicial

activities, all of which can undermine the viability and the

existence of the defendants before the Court reaches the merits

of this case.

THE COURT:  Why would you suffer an irreparable injury

if you didn't have notice?  The Web host suffers potential

liability if he has notice that you're committing an

infringement.  He gets the same notice with or without

immediate effectiveness of a letter.

MR. TILEWICK:  Your Honor, as my cocounsel said, it's

very difficult to unscramble the egg.  What we had to do in

order to obtain the kind of quasi-relief respect to the

elementscode.com.

THE COURT:  You just talk off the chairs.  You put on

the Web that you were selling these Barcelona replicas and a

notice came to the host and you immediately took down those

pages so that you were no longer offering the Barcelona

replicas.

MR. TILEWICK:  There's no guarantee that that would

occur in the future.  There's no guarantee if they were more

aggressive in the future, in terms of providing notice to the

ISPs, to Customs, or some other agency that we'll have the same

ability to recover.  We were lucky there, although we were

deprived, I must add, of our ability to establish in this case

that on that Web site they were selling chairs that did not

C3cWknoC

1    infringe the trademarks.  We had a partial victory, but it

2    wasn't because of your Honor's rulings on the trademarks.  We

3    had a partial ruling because they engaged in self-help while

4    they vested jurisdiction with this Court to decide that very

5    issue.

6            THE COURT:  Who engaged in self-help?

7            MR. TILEWICK:  Knoll, by contacting the ISP.

8            THE COURT:  The ISP suffers potential liability if,

9    with notice, it hosts an infringing articles.  The ISPs have

10   fought long and hard to have a safe harbor, and that safe

11   harbor ends when they get notice.  If Mr. Gottlieb allows

12   infringing articles to be put on the Web page and doesn't put

13   the host on notice, he may lose his rights against the host and

14   he doesn't want to do that.

15           MR. TILEWICK:  Your Honor --

16           THE COURT:  I don't see the point.

17           First of all, if the host gets notice, the host will

18   take it down, whether there's an immediate effect or not, and

19   whether there's a ten-day delay or not.  In the meantime, the

20   holder of the trademark has to suffer continuing infringements

21   which causes him to suffer irreparable injury.  So if I'm

22   saving you from irreparable injury, as you want me to do, I

23   immediately impose irreparable injury on the holder of the

24   trademark, and I don't want to do that.

25           MR. TILEWICK:  Your Honor.

C3cWknoC

1          THE COURT:  The second criteria that's important is

2     that there are remedies available at law, such as monetary

3     damages.  You've got to show that they're inadequate to

4     compensate for that injury.  But I think that goes both ways.

5     You both have it and you both don't have it.  So that's a

6     neutral one.

7          I'm reading all of these from the Second Circuit's

8     decision of Salinger v. Fredrik Colting, 697 F.3d 68 (2d Cir.

9     2010).  The third criteria is considering the balance of

10    hardships between the plaintiff and defendant, a remedy in

11    equity is warranted.  I think the hardships are equivalent

12    because the plaintiff suffers the loss of all the goodwill in

13    his trademarks.  You suffer the loss of being able to sell, and

14    I think that's a neutral.

15         Fourth, public interest would not be disserved by

16    permanent injunction.  I think the public interest would be

17    served.  What's not in here is the probability of success, but

18    it has to be part of the background here.  I believe that the

19    principal register was properly sought, trademarks were

20    properly granted, and that in any of these things, you can't

21    satisfy your burden of showing irreparable injury that will be

22    outweighed by the irreparable injury suffered by the plaintiff.

23    The fact that you're small and they're large, I don't know how

24    to deal with that.  You may be small and profitable in

25    relationship to your business.  They may be large and not so

C3cWknoC

| | |
|---|---|
| 1 | very profitable in relationship to their business.  I don't |
| 2 | know, and I can't find out.  But it does seem to me that if I |
| 3 | worry about your irreparable injury, I cause irreparable injury |
| 4 | to the plaintiff.  And since the plaintiff has the trademark |
| 5 | and the public is interested in the trademark and I don't want |
| 6 | the public to be deceived and I think they will be deceived by |
| 7 | your use of the Web to market your goods, I deny your motion |
| 8 | for preliminary injunction. |
| 9 | MR. TILEWICK:  Can I request a minute for rebuttal, if |
| 10 | necessary? |
| 11 | THE COURT:  Go ahead. |
| 12 | MR. TILEWICK:  There are just two points I want to |
| 13 | make. |
| 14 | As far as irreparable injury to the plaintiff, I don't |
| 15 | understand what that irreparable injury really is since the |
| 16 | issue before the Court presently is the validity of their |
| 17 | trademarks.  They've brought an action for infringement.  The |
| 18 | Court has ruled on the motion on the judgment of the pleadings, |
| 19 | but obviously the merits on the case have not been reached. |
| 20 | All we're asking for is not an injunction preventing them from |
| 21 | doing anything but giving us notice. |
| 22 | THE COURT:  The burden is on you to come into the |
| 23 | court.  If you feel they have overstepped, you can come into |
| 24 | the court. |
| 25 | MR. TILEWICK:  They did. |

C3cWknoC

1          THE COURT:  Well --

2          MR. TILEWICK:  They did overstep.  That's precisely

3     what happened.  That's why we're asking for notice?

4          THE COURT:  In what respect did they overstep.

5          MR. TILEWICK:  Because the letter they wrote to one of

6     the two Web sites that the defendants own stated that the

7     entire Web site was infringing.  That was false.  He was shut

8     down.  His entire business was shut down and there were almost

9     no products on that site which they remotely claimed infringed.

10    It was only because we got involved and were lucky enough to

11    contact them and to work with them.

12         THE COURT:  If you write any more letters like this or

13    your client does, your client should focus on what is

14    infringing and not the entire Web site.

15         MR. GOTTLIEB:  Your Honor, in our letter, we set forth

16    our registrations, we tell them what products are infringing.

17    All these hosts have their own counsel.  They have their own

18    guidelines, and it's up to the host and the Moderno to decide

19    leave it up, take it down, and, in fact, right now, your

20    Honor --

21         THE COURT:  I'm not granting preliminary injunction.

22         MR. TILEWICK:  Thank you, your Honor.

23         MR. KATSH:  Your Honor, I have one question in light

24    of the argument and your rulings today.  We have certain

25    remaining defenses, abandonment, and some others, but if your

C3cWknoC

1    Honor is going to issue an opinion and a ruling saying that

2    these designs are not functional and dismissing --

3             THE COURT:  I'm not doing anything more than I did.  I

4    just denied your motion.  I'm not writing an opinion.  I'm not

5    passing on the merits overall.  My next point was to ask you

6    when you wanted to come in to see how we're going to run this

7    case from here on in.  So your concerns are not kosher, Mr.

8    Katsh.  I know that you have other affirmative defenses,

9    including the defense of abandonment.  I'd like to hear what

10   you're going to say, what kind of discovery you want, and how

11   you want to run the case.  I'm not ruling on those things.  I'm

12   not throwing you out of court.

13            MR. KATSH:  I completely understand that.

14            THE COURT:  What's your concern?

15            MR. KATSH:  It's not a concern.  It's a question of

16   whether we should go forward in light of your Honor's

17   incarnation on what is to us the very core issue in our case.

18   Our client has limited resources.

19            THE COURT:  I am not prejudging the case.  I have

20   purposely decided narrowly and not broadly, but I do think it's

21   appropriate to let you know what I'm thinking at the present

22   time.  I'm not saying you can't change my mind.

23            MR. KATSH:  Okay.

24            THE COURT:  People often do.

25            MR. KATSH:  Thank you, your Honor.

C3cWknoC

1          THE COURT:  I think there is a utility in knowing

2     where I stand.  I've read the papers.  I've spent time on this.

3     I've thought about it.  Why shouldn't I tell you how I'm

4     thinking.  It's not saying I can't change my mind.  I often do.

5          MR. KATSH:  I appreciate that very much.  Thank you.

6          THE COURT:  And the reason I'm not going beyond where

7     I stand on this is because I don't feel I've thought about this

8     enough to make acceptable judgments about the overall case.

9          MR. KATSH:  The transcript of oral argument before

10    Traffix, that will convince you.

11         THE COURT:  Thank you, Mr. Katsh.

12         We have the next conference set for May 18.  I'm

13    willing to keep that date unless you want something earlier.

14    Here's what I want you to do, and then we can go off the

15    record, if you like.  I'm going to issue today or tomorrow a

16    summary order that states my rulings, but it won't go beyond

17    that.

18         Mr. Katsh, if you're thinking of appealing my order on

19    the preliminary injunction, I'll need to state more findings on

20    the record, but if you're not --

21         MR. KATSH:  No, sir.

22         THE COURT:  -- no need to do so.

23         MR. KATSH:  No, sir.

24         THE COURT:  So I'm not.

25         I'd like you to get together and discuss your

C3cWknoC

1    respective plans for the case.  You need to exchange your

2    preliminary discovery.  Stop looking for interrogatories and

3    other things.  We're going to keep the transaction costs low.

4         You, Mr. Gottlieb, give your file on these chairs.

5    And, Mr. Katsh, you give your file on Ibiza and whatever else

6    is relevant to the plaintiff and the complaint and the answer

7    to Mr. Gottlieb and go over those and exchange your plans for

8    how you want to proceed with discovery and then I'll meet with

9    you.  I think May 18 may be an appropriate date.

10        MR. KATSH:  It could be.  We've gotten hung up a bit

11   on getting a protective order entered.  The plaintiff, and I

12   respect their decision, didn't want to produce confidential

13   documents until we have a protective order in place.  I think

14   we're there now and I think the document production --

15        THE COURT:  Let's leave it this way, may 18, 10:00,

16   for a status conference in this case.  If you have problems

17   before that, let me know, and I'll have you in and we can

18   resolve the problems.  I'm sensitive to what you say, Mr.

19   Katsh.  You don't have much money to run this case.  I don't

20   want your lack of money to affect the ability to go to the

21   merits if you want to go that way, so I'll work with you, and I

22   want Mr. Gottlieb to be sensitive to that as well.  I'll work

23   with both of you to keep the transaction costs low.

24        MR. KATSH:  Thank you.

25        THE COURT:  That means if you have disputes I'll

C3cWknoC

1   resolve the disputes by letter.  If you want to come in, I'll

2   decide whether it's necessary or not.  But there's no reason

3   for the transaction costs to go up.

4            Anything else?  Thank you both.

5            (Proceedings adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25