UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

KNOLL, INC.

              Plaintiff and Counter-
              Defendant,                      No. 11 Civ. 0488 (AKH)

     -against-                             ECF Case

MODERNO, INC. AND URBAN MOD, INC. d/b/a     **Demand for a Jury Trial**
REGENCY SHOP, AND MIKE SAXENA

              Defendants and Counter-
              Plaintiffs.
_____

## DEFENDANTS' AND COUNTERCLAIM-PLAINTIFFS' SUPPLEMENTAL AND AMENDED COUNTERCOMPLAINT AND SECOND AMENDED ANSWER

    Defendants, Moderno, Inc. and Urban Mod, Inc. d/b/a RegencyShop and Mike Saxena, through their undersigned counsel, hereby set forth their Supplemental and Amended Countercomplaint and Second Amended Answer to the Amended Complaint.

### SUPPLEMENTAL AND AMENDED COUNTER-COMPLAINT
#### NATURE OF THE CASE

    1) Counter-Plaintiffs bring these claims for damages under New York State Law common law for tortuous interference with contract, tortuous interference with prospective business relationships, and prima facie tort; for a declaratory judgment under 28 USC § 2201 and §2202 and Lanham Act §37, 15 USC §1119, that Counter-Defendant Knoll's trademarks, numbers 2,893,025 (Barcelona Chair), 2,894,977 (Barcelona Stool), 2,894,980 (Barcelona Couch), 2,894,979 (Barcelona Table), 2,894,978 (Flat Brno Chair), and 772,313 (BARCELONA word mark), are invalid and should be canceled under the Lanham Act §14(3), 15 USC §1064(3) and Article 1, Section 8 of the United States Constitution; and for damages under Lanham Act §38, 15 USC

1

§1120.

2)        Counter-Defendant Knoll has manipulated trademark law in bad faith to secure itself an exclusive market in the Barcelona Collection[1] design furniture.  Counter-Defendant filed for trademarks in the Barcelona Collection, and then used those trademarks as a basis upon which to file a multitude of lawsuits against small businesses that were legitimately producing the Barcelona Collection.  Counter-Defendant has monetary reserves these small businesses do not possess, which it uses to force the small businesses to settle before the merits of the case can be heard.  In this case, after Counter-Plaintiffs refused to settle, Counter-Defendant, in bad faith, began a campaign to shut down Counter-Plaintiffs' website, in an effort to render Counter-Plaintiff unable to economically sustain itself, and place Counter-Plaintiffs in jeopardy of going bankrupt before the case progressed to trial.

### THE PARTIES

3)        Counter-Plaintiffs are a small business and small business owner, located at 1625 W. 144th Street, Unit 2, Gardena, California 90247.  Defendants sell modern furniture on the websites Regencyshop.com and Elegancecode.com.

4)        Counter-Defendant Knoll is a large furniture company that also sells modern furniture.  Counter-Defendant is a corporation organized and existing under the laws of the State of Delaware, maintaining a place of business at 76 Ninth Avenue, New York, New York 10021.

### JURISDICTION AND VENUE

5)        This Court has jurisdiction pursuant to 28 USC §1331 over the declaratory judgment claim, 28 USC §1338 over the trademark claims and 28 USC §1367 for supplemental jurisdiction over the state law claims.

---

[1] The Barcelona furniture or Barcelona Collection comprises the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, and the Flat Brno Chair.  Defendants/Counter-Plaintiffs use these terms not as an indication of source or trademark, but rather to describe the aforementioned furniture as products, and to describe the designs of said furniture.

6)      Venue is proper pursuant to 28 USC §1391 because Counter-Defendant has a place of business in New York.

## FACTS COMMON TO THE COUNTER-COMPLAINT

7)      Knoll has a history of abusing intellectual property laws to illegitimately claim exclusive rights to public domain furniture items. Knoll's abuse of intellectual property laws is geared towards eliminating competition and forcing consumers to pay exorbitantly high prices for public domain products.

8)      In 1950, in the court case regarding Knoll's copyright of the Hardoy Chair, Knoll tried to abuse copyright laws to assert an exclusive right to sell the Hardoy chair.[2] However, U.S. courts invalidated Knoll's claims of exclusivity while affirming the public domain status of the Hardoy chair.[3]

9)      Knoll tried to abuse copyright laws to acquire illegitimate exclusivity to the Hardoy Chair. Similarly in the case at bar, Knoll is trying to abuse trademark laws to acquire illegitimate exclusivity of production to the Barcelona furniture. Barcelona furniture has existed in the public domain since the expiration of its three patents.[4]

---

[2] Knoll Museum, Hardoy Chair 198, http://www.knoll.com/museum/prod_museum.jsp?prod_id=375 (last visited July 2, 2012).
[3] Chantal Lamers, *Leather Butterfly Chair Returns*, SF GATE, Mar. 15, 2012, http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2012/03/15/HOIN1NJMVA.DTL.
[4] In 1929, the German patent office issued Ludwig Mies van der Rohe ("Mies") a patent (Patentschrift Nr. 486722) for a chair made of metal rails linked crosswise as supporting elements ("the German patent"). The patent specification included a figure of a chair substantially identical in appearance to the Barcelona Chair as well as frame configurations present in both the Barcelona Chair and the Barcelona Stool. Green Moving Dec., Exh. 1. In 1931, the Spanish patent office issued Mies a patent for a chair in which the frame of the seat is formed by two or more independent elastic springs ("the Spanish patent"). In 1942, the U.S. Patent Office issued Mies a patent (No. 2,283,755) for various designs of the "C" shaped springs ultimately used in the Brno Chair ("the U.S. patent"). Accompanying illustrations displayed a chair substantially similar to what has become known as the Brno chair. *Alphaville Design, Inc. v. Knoll, Inc.*, 627 F. Supp. 2d 1121, 1125 (N.D. Cal. 2009).

10)     In 2004, Knoll acquired trademarks on the configuration of the Barcelona furniture by making fraudulent misrepresentations to the United States Patent and Trademark Office.[5, 6]

## MIES' CLAIM OF OWNERSHIP OF EXCLUSIVE RIGHTS TO THE BARCELONA FURNITURE IS MATERIALLY QUESTIONABLE AND IS BASED ON FRAUDULENT MISREPRESENTATIONS

11)     The International Exhibitions Bureau (BIE) is an intergovernmental organization created in 1928 to supervise the international exhibitions known as the International Expos or World Fairs.[7] The World Fair of 1929 held in Barcelona, Spain was one of the many World Fairs organized by the BIE.[8] BIE exhibitions themselves serve as a brand representing cutting-edge innovative products which are developed by the international exchange of innovative ideas.[9]

12)     Ludwig Mies van der Rohe ("Mies") and Lilly Reich were hired by the German government to design furniture for the German Pavilion, Germany's entry for the World Fair of 1929.[10] The most popular items from these World Fairs get the benefit of being associated with the brand goodwill of these expositions, as the name of the exposition becomes an adjective to describe the product itself.[11] For example, the German furniture designed by Lilly Reich became known as the Barcelona furniture because it was presented at the World's Fair in Barcelona.[12]

---

[5] Trademark Registration No. 2,893,025(6), 2,894,977(4) No. 2,894,980(2) No. 2,894,979(3) No. 2,894,978(3) No. 772,313(2) furniture configurations will be collectively referred to as "Barcelona furniture."  Although Knoll claims all of these trademarks are incontestable, "[t]he label 'incontestable' [in trademark law] is misleading because there are as many as twenty-one exceptions to the [incontestability] doctrine. Williamson, *Trade-marks Registered Under the Lanham Act Are Not "'Incontestable'",* 37 TRADE-MARK REP. 404 (1947). In 2009, U.S. District Court of Northern District of California agreed; the court ruled that material issues of facts existed in regards to anyone's exclusive ownership to any trademarks related to the Barcelona furniture. *Alphaville Design, Inc. v. Knoll, Inc.*, 627 F.Supp.2d 1121.

[6] Memorandum of Points and Authorities in Support of Motion for Summary Judgment filed by Alphaville Design, Inc., David Lee, Peggy Lee *Alphaville*, 627 F. Supp. 2d 1121 (No. 3:07-cv-05569).

[7] Bureau International des Expositions, History, http://www.bie-paris.org/site/en/main/history.html.

[8] M. CARMEN GRANDAS, L'EXPOSICIÓ INTERNACIONAL DE BARCELONA DE 1929 110-112 (1988).

[9] Patrick De Groote, *A Multidisciplinary Analysis of World Fairs (= Expos) and Their Effects*, TOURISM REV., Vol. 60 Iss: 1, 12-19 (2005).

[10] SONJA GÜNTHER, LILLY REICH, 1885-1947: INNENARCHITEKTIN, DESIGNERIN, AUSTELLUNGSGESTALTERIN (GERMAN ED.), (1988).

[11]     *Id.* at 11

[12] CHRISTIANE LANGE, LUDWIG MIES VAN DER ROHE & LILLY REICH: FURNITURE AND INTERIORS (2007).

13)    Mies could not have exclusive rights to the Barcelona furniture as the Barcelona furniture was created as a work for hire for the German government and, according to German intellectual property laws, the German government owned equal if not greater rights to the Barcelona furniture.[13]

14)    Additionally, Mies could not have exclusive rights to the Barcelona furniture as designer; Lilly Reich, completely designed all of the Barcelona furniture.[14] (*See* Exhibit 1) Mies deprived Ms. Reich of due credit for her work while acquiring patents solely for himself.[15] In this respect he conformed to the European tradition, prevalent in the early twentieth century, of denying female innovators due credit for their share of intellectual breakthroughs.[16]

15)    However, despite the aforementioned facts that Mies could not have exclusive rights to the Barcelona furniture,  Mies improperly acquired patents on the Barcelona furniture in Germany in 1929, in Spain in 1939 and USA in 1942.[17]

16)    Mies could not have exclusive rights to the Barcelona furniture, as scholars have suggested that the Barcelona furniture was solely designed by Lilly Reich.[18] While it is difficult to apportion the contribution that each made to a particular design, it is noteworthy that Mies had never designed any furniture before he entered into a collaboration with Ms. Reich, and he never

---

[13] *Id.* at 12; *See also* JÜRGEN MEIER. VOSSIUS & PARTNER, THE RIGHT TO A EUROPEAN *PATENT* AND THE *GERMAN ACT* ON EMPLOYEE'S INVENTIONS (2006) ("Employer has the right to claim the invention").
[14] *Lilly Reich, 1885-1947: Innenarchitektin, Designerin, Austellungsgestalterin (German Edition) by Sonja Günther (1988)*
[15] Lilly Reich is never mentioned as a patentee in any of any the three patent applications.
[16] *See, e.g.*, Ruth Lewin Sime, *Lise Meitner: A Life in Physics* (1997) (Austrian and Swedish physicist Lise Meitner denied due credit for her contributions in discovering Nuclear Fission, a phenomenon which serves as a fundamental building block of Nuclear energy and the atomic arsenal); Anne Sayre, *Rosalind Franklin and DNA* (1975) (British scientist Rosalind Franklin denied due credit for her contribution in discovery of the structure of DNA, the fundamental building block of life).
[17] *Alphaville Design, Inc. v. Knoll, Inc.*, 627 F.Supp.2d 1121 (N.D. Cal. 2009).
[18] *Id.* at 12, Id at 14, See also *Barcelona Chair,* Wikipedia (July 2, 2012, 6:34 PM), http://en.wikipedia.org/wiki/Barcelona_chair ("While Reich always deferred to van der Rohe in public, the reverse was said to have been the case in private. While it is naturally difficult to apportion the contributions that each made to a particular design, it is interesting and poignant to note that van der Rohe never again produced any furniture designs after their partnership ended, nor had he designed any furniture beforehand. His first patent on a furniture design was issued in 1927 and his last in 1937.")

produced any furniture designs after his partnership with Ms. Reich ended..[19] His first patent on a furniture design was issued in 1927 and his last in 1937.[20] Scholarly literature also supports the fact that Lilly Reich, until her death, solely designed all the furniture of all of Mies' architectural projects.

17)     Mies relocated to the USA in 1937 and made no effort to save Ms. Reich from the war in Germany. [21] Ms. Reich died in 1947 after being subjected to atrocities of war in Nazi Germany.[22]

18)     Ms. Reich never assigned any rights to Mies or Knoll. The patents on the Barcelona furniture had expired decades before 1953, when Knoll acquired rights to the Barcelona furniture from Mies.[23] Mies did not apply for a U.S. trademark on the Barcelona furniture during his lifetime, as U.S. lawmakers have exhibited a sincere dislike towards product configuration patents and product configuration trade dress.[24]

19)     Throughout his lifetime, Mies gave no credit to the real designer of Barcelona furniture, Lilly Reich. Throughout his lifetime Mies never acknowledged the German government's rights in the Barcelona furniture. By ignoring both the contribution of the real designer of Barcelona furniture Lilly Reich and the German government's rights in the Barcelona

---

[19] *Id.*

[20] *Id.*

[21] *Mies Van Der Rohe, Biography,* Designboom, http://www.designboom.com/portrait/mies/bg.html (last visited July 2, 2012).

[22] *Id.* at 12; *See also id.* at 14.

[23] "Alphaville contends that these statements were false representations regarding a material fact because several expired U.S. and foreign patents existed that would have been material to the USPTO's decision to issue registrations for the designs." *Alphaville,* 627 F. Supp. 2d at 1132.

[24] In U.S. Constitutional Limits of Product Configuration Trade Dress Rights, 97 Trademark Rep. 752 (2007), K. Horlander argues that trade dress protection for subject matter once disclosed in a patent is unconstitutional. *Id.* Trademark protection for trade dress has also been disapproved with an argument arising from the literal interpretation of section 45 of the Lanham Act, which includes in the protectable subject matter words, names, symbols, or devices, or any combination thereof. Glynn S. Lunney, *The Trade Dress Emperor's New Clothes: Why Trade Dress Does Not Belong on the Principal Register,* 51 Hastings L.J. 1131, 1138-48 (2000), argues that the terminology of section 45 of the Lanham Act refers to the distinction between technical trademarks and tradenames of the previous law and therefore it is evident that the federal legislator did not intend to protect trade dress in the absence of fraud.

furniture, Mies improperly acquired exclusive patents to the Barcelona furniture in three

different countries.[25]

## OWING TO THE MANDATE OF PATENT LAW, UPON EXPIRATION OF THE THREE PATENTS COVERING THE BARCELONA FURNITURE, THE BARCELONA FURNITURE ENTERED THE PUBLIC DOMAIN

20)     The Barcelona furniture entered the public domain upon the expiration of the

German, Spanish and U.S. patents decades before 1953, the year in which Knoll allegedly

acquired rights from Mies.[26] The expiration enabled the unlicensed production of the Barcelona

furniture worldwide. [27]

21)     Long before Knoll acquired anything from Mies, international manufacturers had

been manufacturing and selling the Barcelona furniture without any authorization from Knoll.[28]

22)     The policy rationales behind U.S. intellectual property laws astutely balance two

competing notions. U.S. patent law creates a legal regime which allows innovators to profit from

their innovations via granting them sole production rights for a limited time[29], while balancing

the need for society to "stand on the shoulders of giants"[30]. Even Mies' Barcelona furniture was

modeled after the thrones of the Egyptian Pharaohs. The framers of the U.S. Constitution were

aware that for progress to continue, a new stream of innovators should be allowed to benefit

---

[25] *Id.* at 16.

[26] *Id.* at 4.

[27]    Complaint, filed by Knoll, Inc. (Even in the remote corners of Australia, a company has been manufacturing Barcelona furniture since 1953), Knoll, Inc. v. Palazzetti Express, Inc., 2001 WL 1568317 (S.D. N. Y.)(No. 1:04-cv-08801-DLC).

[28] *Id.*

[29] *See* U.S. Const. art. I., § 8, cl. 8, *see also*, *e.g.*, *Scott Paper Co. v. Marcalus Mfg. Co.,* 326 U.S. 249, 255 (1945), The U.S. Constitutional Limits of Product Configuration Trade Dress Rights, 97 TRADEMARK REP. 752 (2007) ("[t]o promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries.").

[30]  *See* Tom Saunders, *Renting Space on the Shoulders of Giants: Madey and the Future of the Experimental Use Doctrine*, 113 YALE L.J. 261 (2003) (Sir Issac Newton, inventor of calculus and discoverer of laws of gravity, stated that he had been able to achieve so much intellectually as he "stood on the shoulders of giants", a statement which has become a commonly quoted Western metaphor meaning "to develop future intellectual pursuits by understanding the research and works created by notable thinkers of the past.").

from historic inventions; hence they enumerated the limited time clause in Article 1, Section 8, Clause 8 of the U.S. Constitution.[31]

23)     Limitations placed on exclusive rights on inventions also appear in the Patent Act. Disclosure and enablement are intrinsic parts of a patent application, requiring prospective patent owners to provide reproducible instructions enabling others to replicate a new invention.[32] The U.S. Supreme Court has repeatedly recognized the public's right to copy expired patents,[33] and has repeatedly ruled against a patentee's efforts to artificially extend exclusive rights to an invention via creative legal methods.[34]

24)     The fundamental difference between U.S. trademark protection and US patent protection is that patent rights expire at the end of 17 years,[35] whereas trademark rights are

---

[31] *Id.* at 31.

[32] *See* Alan Devlin, *The Misunderstood Function of Disclosure in Patent Law*, 23 HARV. J.L. & TECH. 401, 417 (2010).

[33] *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 165 (1989) ("For almost 100 years it has been well established that in the case of an expired patent, the federal patent laws do create a right 'to copy and to use.'") (citing Singer Mfg. Co. v. June Mfg. Co., 163 U.S. 169 (1894)); *see also* subpart II.C (recounting the history of the right to copy).

[34] *See Specialized Seating, Inc. v. Greenwich Industries, L.P.*, 616 F.3d 722 (7th Cir. 2010), *See also C. & G. Merriam Co. v. Syndicate Publishing Co.*, 237 U.S. 618 (1915). The background to that suit is useful to an understanding of the Supreme Court's decision, and is provided in Section 10.12 of McCarthy on Trademarks: "The first "Webster's Dictionary" was published in 1828 and later the Merriam Publishing Company acquired the rights from the heirs of Noah Webster and published a revised edition in 1847. … [I]n 1899 the copyright on the 1847 edition expired. Then many publishers rushed to put out "Webster's Dictionaries" based on the public domain 1847 work. Merriam brought many lawsuits against these publishers, alleging that [the mark] WEBSTER had acquired a secondary meaning, not only as denoting dictionaries based on the original Webster's, but also as denoting dictionaries published only by the Merriam publishing house. The courts generally held that defendants had the right to use WEBSTER to describe a public domain work and its literary source, but could not do so in such a way as to confuse the public into thinking that defendants' books were published by Merriam." The Supreme Court agreed with the lower courts that Merriam could not extend its expired copyright through registration of the trademark WEBSTER: "[T]he registration of the trademarks relied upon, having the name "Webster" as applied to dictionaries of the English language as their chief characteristic, was made long after the expiration of the copyright securing to the publishers the exclusive right to publish the Webster dictionaries. After the expiration of a copyright of that character, it is well settled that the further use of the name by which the publication was known and sold under the copyright cannot be acquired by registration as a trademark; for the name has become public property, and is not subject to such appropriation … .".

[35] *See* 35 U.S.C. § 154(a)(2) (2006). The term of a patent usually ends 20 years from the date on which the application for the patent was filed in the United States or, if the application contains a specific reference to an earlier filed application or applications under section 120, 121, or 365(c) of this title, from the date on which the earliest such application was filed.

perpetual.[36] Hence allowing an invention to acquire trademark protection will extend the inventor's monopoly through perpetuity, which is a direct violation of the limited times clause of Article 1, Section 8, Clause 8, as it disables the ability of new inventors to "stand on the shoulders" of historic innovators.[37]

25)    Some courts have sought to seek harmony between Patent and Trademark law in terms of the limited times doctrine by holding that "The trademark owner has an indefinite term of protection, it is true, but in an infringement suit must also prove secondary meaning and likelihood of confusion, which the owner of a design patent need not do; there is therefore no necessary inconsistency between the two modes of protection." *Kohler Co. v. Moen Inc.,* 12 F.3d 632, 638 (7th Cir.1993)). However, this approach is misinformed as it places an undue burden on the public's "unfettered right to copy and use" an expired patent. The U.S. Supreme Court has explicitly held that "For almost 100 years it has been well established that in the case of an expired patent, the federal patent laws *do* create a federal right to 'copy and to use.' *Sears* and *Compco* extended that rule to potentially patentable ideas which are fully exposed to the public." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989). By requiring the public to expend time and money in litigating an infringement suit every time the public needs to utilize its unfettered right to copy and use is an undue burden placed on a constitutional right. The compelling state interest standard is violated when a regulation entirely frustrates or heavily burdens the exercise of constitutional rights. Hence, the harmony approach is misinformed and should not be allowed to place an undue burden on the constitutional right to copy and use. ("[N]othing that the public has a right to copy, in the

---

[36] "Unlike a design patent, which expires after fourteen years, a trademark registration potentially lasts forever." See *Compare* 15 U.S.C. §1058(a) (2006) (providing that trademark registration lasts for a period of ten years), *and* 15 U.S.C. §1059(a) (2006) (permitting trademark registration renewal at the end of each successive ten-year registration period), *with* 35 U.S.C. §173 (2006) (limiting design patent protection to fourteen years).
[37] *Id.* at 6, 26.

absence of valid patent or copyright protection, can be the subject of a valid trademark registration."); *Sylvania Elec. Prods., Inc. v. Dura Elec. Lamp Co.*, 247 F.2d 730, 733 (3d Cir. 1957).

26)   Another difference between trademark law and patent law is that the basic goal of trademark law is to enable trademarks to be used as source identifiers for their producers, whereas patent law allows inventors a monopoly on their products for a limited period of time.[38] The U.S. Supreme Court has overwhelmingly rejected inventors' attempts to extend their monopoly after the expiration of patent rights via creative use of trademark or copyright law. [39]

27)   Additionally, the expiration of a monopoly on a newly invented good after 17 years leads to an increase in manufacturing of the newly invented good upon patent expiration, ultimately lowering the price of the newly invented good for the average consumer. [40]

28)   Globally, independent manufacturers have flooded the market with Barcelona furniture since the expiration of the patents mentioned above.[41] Even in a remote corner of Australia a company has been manufacturing Barcelona furniture since 1953.

## KNOLL ACQUIRED TRADEMARKS TO BARCELONA FURNITURE BY MAKING FRAUDULENT MISREPRESENTATIONS TO THE USPTO

29)   A part of Mies' legacy happens to be his ability to misrepresent relevant evidence to the legal system in order to acquire exclusive rights to intellectual property owned by third parties.[42]   It is interesting to note that Mies settled in Chicago, Illinois and sold the rights to the

---

[38] *Id.* at 39.

[39] *Id.* at 6.

[40] *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 165, 109 S.Ct. 971, 985, 103 L.Ed.2d 118 (1989); *American Safety Table Co. v. Schreiber*, 269 F.2d 255, 271–72 (2d Cir.), *cert. denied*, 361 U.S. 915, 80 S.Ct. 259, 4 L.Ed.2d 185 (1959).

[41] COMPLAINT against Knoll, Inc. (Filing Fee $ 150.00, Receipt Number 528897)Document filed by Casprini Gruppo Industriale S.p.a. (jjm, ) Additional attachment(s) added on 12/20/2004 (jjm, ). (Entered: 12/14/2004) *See also* ANSWER to Complaint., COUNTERCLAIM against Knoll, Inc.. Document filed by Palazzetti Express, Inc.. (Attachments: # 1 Exhibit Exhibit 1# 2 Exhibit Exhibit 2# 3 Exhibit Exhibit 3# 4 Affidavit Service by Mail) (Gordon, Hiram) (Entered: 11/30/2004)

[42] Depriving Lilly Reich credit for her contribution in the furniture designs, getting sole patents on work for hire furniture.  *See id.* at 12 and 14.

Barcelona chair to a Pennsylvania company, Knoll, when large publically traded furniture manufacturers like Herman Miller and HNI Corp. are a stone's throw from Chicago.[43] One may speculate that in Knoll, Mies found a business partner who shared views similar to his own with regard to the relationship between manipulation of laws and profitability. Knoll's ability to manipulate the intellectual property laws to acquire exclusive rights to articles of furniture in the public domain has been established in Hardoy.[44]

30)    The similarities between Knoll and Mies do not end there. Knoll paid Mies a total of $150,000 for the Barcelona furniture even though Knoll's sales of the Barcelona furniture amount to $1.07 million annually.[45] This is quite comparable to the negligible recognition Ms. Reich received from Mies for her work on the Barcelona furniture.[46]

31)    Mies did not have any exclusive rights to the Barcelona furniture when he improperly sold his supposed rights to Knoll in 1953, as Mies' patents on the Barcelona furniture had expired decades before 1953, and he had not acquired a U.S. trademark.[47] Hence he did not have any exclusive rights to the Barcelona furniture that could be sold to Knoll.

32)    In November 1968, the Vice President for Marketing of Knoll's predecessor drafted a letter in response to a customer stating, "The Barcelona chair was originally designed by Mies van der Rohe before 1930. The visual design as such, is in the public domain by this point and time.[SIC]"[48] Despite possessing accurate knowledge with regard to the public domain

---

[43] Herman Miller is headquartered only 156 miles from Chicago in Michigan, https://maps.google.com/maps?hl=en (July 2, 2012, 18:00 EST);  HNI is headquartered only 200 miles from Chicago in Iowa, https://maps.google.com/maps?hl=en (July 2, 2012, 18:01 EST);  Knoll is headquartered 768 miles away from Chicago in Pennsylvania https://maps.google.com/maps?hl=en (July 2, 2012, 18:03 EST).

[44] *Id.* at 2.

[45] *Id.* at 16. ("As consideration, Knoll's predecessor agreed to pay Mies a flat fee of $150,000 over the following ten-year period. *Id.,* Exh. 4."); ("June 2003, Knoll sold more than 2,800 units of the Barcelona Chair, resulting in sales of over $8.5 million. Magnusson Dec., Exh. B ¶ 9. The retail price of the Barcelona Chair was $7000-8000 per chair. *Id.* ¶ 16."). *Alphaville Design, Inc. v. Knoll, Inc.*, 627 F.Supp.2d 1121 (N.D. Cal. 2009).

[46] *Id.* at 45, 12 and 14.

[47] *Id.* at 16 and 45.

[48] *Id.* at 16 and 45. ("Indeed, in November 1968, the Vice President for Marketing of Knoll's predecessor drafted a letter in response to a customer stating, 'The Barcelona chair was originally designed by Mies van der Rohe before

status of the Barcelona furniture, Knoll filed for an application for trademarks on the Barcelona

furniture in 2003.[49] Knoll's misrepresentation illustrates nothing but disdain for the legal process

and disregard for the intent of trademark law.[50]

  33) In its trademark application, Knoll committed fraud on the United States Patent

and Trademark Office (USPTO) by not disclosing the existence of expired material utility

patents in its trademark applications for five Barcelona collection designs.[51] The supporting

declarations from Knoll's Vice President, Carl G. Magnusson, stated that the designs were not

subject to patent protection.[52] A utility patent "is strong evidence that the features therein claimed

are functional," hence that they are ineligible for trademark protection. [53,54,55]

  34) In its trademark application, Knoll committed fraud on the USPTO by claiming

that it was the exclusive and dominant producer of the Barcelona furniture, and that the public

has come to associate Barcelona furniture with Knoll's productions exclusively.[56] Carl G.

---

1930. The visual design as such, is in the public domain by this point and time. [SIC] We have the exclusive rights from Mies van der Rohe to manufacture his designs and to use his name in connection with them.' Green Moving Dec., Exh. 4.").

[49] U.S. Trademark Nos. 2,893,025 (Barcelona Chair), 2,894,977 (Barcelona Stool), 2,894,980 (Barcelona Couch), 2,894,979 (Barcelona Table), 2,894,978 (Flat Brno Chair) (filed Oct. 22, 2003).

[50] *Hachette Filipacchi Presse v. Elle Belle, LLC*, 85 U.S.P.Q.2d 1090, 1094 (T.T.A.B. 2007) (finding that "respondent and its attorney shared the duty to ensure the accuracy of the application and the truth of its statements."); Jeffrey M. Samuels. *Ethical Considerations for Attorneys Practicing Before the PTO in Trademark Cases*, TRADEMARKS, COPYRIGHTS, & UNFAIR COMPETITION FOR THE GEN. PRACTITIONER 177, 184 (ALI-ABA Continuing Legal Education Course of Study 1993).

[51] *Alphaville Design, Inc. v. Knoll, Inc*, .627 F.Supp.2d 1121 (N.D. Cal. 2009).

[52] *Id.* at 51. ("In 2003, Knoll filed trademark applications with the U.S. Patent and Trademark Office (USPTO). These applications sought trademarks for drawings representing the five designs at issue. Carl G. Magnusson, Knoll's Executive Vice President for Design, reviewed and signed a declaration supporting each of these applications. Magnusson Dec. ¶ 8. In each application, Magnusson declared that (1) "no other person, firm, corporation or association has the right to use said mark in commerce," and (2) the design "is not subject to any patent protection or application." *Id.*, Exh. B. Terence Riley, Chief Curator of Architecture and Design at the MoMA, also submitted a declaration with the application. Green Moving Dec., Exh. 13.").

[53] *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29; 121 S.Ct. 1255; 149 L.Ed.2d 164 (2001).

[54] *Id.* at 34; 121 S.Ct. 1255 (""The Lanham Act,' we have said, 'does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity.'"); In Re Trade–Mark Cases, 100 U.S. 82, 94; 25 L.Ed. 550 (1879); Dastar Corp. v. Twentieth Century Fox Corp., 539 U.S. 23 (2003) (federal trademark law "has no necessary relation to invention or discovery").

[55] Since inventions covered by utility patents pass into public domain when the patent expires, it is inappropriate to use trademark law to afford extended protection to the patented invention. *Specialized Seating, Inc. v. Greenwich Industries, L.P.*, 616 F.3d 722 (7th Cir. 2010).

[56] *Alphaville Design, Inc. v. Knoll, Inc.*, 627 F.Supp.2d 1121 (N.D. Cal. 2009).

Magnusson, Knoll's Executive Vice President for Design, fraudulently declared to the USPTO that Knoll made substantially exclusive use of the Barcelona furniture. When Knoll filed its respective trademark applications for the five designs, it submitted supporting declarations from Magnusson for each. In these declarations, Magnusson stated that the designs had become distinctive by reason of Knoll's substantially exclusive use in commerce. Magnusson did not disclose to the USPTO that third parties were producing and selling furniture based on these designs. Magnusson's failure to disclose the use of the designs by third parties was a knowing falsehood.  Indeed, in November 1968, the Vice President for Marketing of Knoll's predecessor drafted a letter in response to a customer stating, "The Barcelona chair was originally designed by Mies van der Rohe before 1930. The visual design as such, is in the public domain by this point and time."[SIC] Other 1990 and 1991 letters drafted by Knoll explicitly or implicitly acknowledge the existence of numerous unauthorized reproductions. These actions demonstrate that Knoll knew others had superior or clearly established rights to use the designs.  Knoll intentionally misled the USPTO and is trying to mislead this court with the claim that since 2001 Knoll has been the exclusive and dominant source of Barcelona chairs. A simple Internet search reveals numerous producers worldwide who have been producing Barcelona furniture.

35)     "In addition, if the practitioner, applicant, or registrant becomes aware of any misrepresentation made in the application or registration, Office Action response, or supporting affidavits, the case law and rules indicate that there is a continuing duty of candor to correct the misrepresentation once known."[57] 37 C.F.R. § 10.85(b)(1) also requires that if a practitioner receives information clearly establishing that a client has, in the course of representation, perpetrated a fraud upon the USPTO, the practitioner "shall promptly call upon the client to

---

[57] USPTO Representation of Others Before the Patent & Trademark Office, 37 C.F.R. § 10.23(b)(4), (c)(2)(ii) *Space Base Inc. v. Stadis Corp.*, 17 U.S.P.Q.2d (BNA) 1216, 1219 (T.T.A.B. 1990).

rectify the same, and if the client refuses to do so the practitioner shall reveal the fraud to the PTO."[58] Even though Knoll and attorneys at Gottlieb, Rackman & Reisman, P.C. became explicitly aware of the two misrepresentations made to the USPTO in acquiring the trademarks in Barcelona furniture during the course of litigation with Alphaville in 2009, to date Knoll has made no attempts to disclose these material misrepresentations to the USPTO.[59]

36)     With an application filled with fraudulent misrepresentations, Knoll, on October 22, 2003, filed trademark applications to register the configurations of the Barcelona Chair, Barcelona Stool, Barcelona Couch, and Barcelona Table and the Flat Brno chair. In October of 2004, the Trademark Office issued the following registrations for the product configurations under Section 2(f) of the Lanham Act, 15 U.S.C. 1052(f), based on Knoll's assertion or claim that each of those configurations had acquired distinctiveness or secondary meaning:

Registration No. 2,893,025 is for the configuration Barcelona chair.

Registration No, 2,894,977 is for the configuration Barcelona ottoman.

Registration No. 2,894,980 is for the configuration Barcelona couch.

Registration No. 2,894,979 is for the configuration Barcelona table.

Registration No. 2,894,978 is for the configuration of Brno chair.

37)     Knoll's misrepresentation was evident to the Northern District Court of California, such that, despite Knoll's possessing incontestable trademarks, Judge Patel denied its motion for summary judgment. Judge Marilyn Hall Patel held:

"Knoll has not proven as a matter of law that the Mies designs are not in the public domain. Indeed, the extensive sales of furniture based on the Mies designs by companies not authorized by Knoll to do so suggests otherwise. In the same vein, although summary judgment cannot be granted to Alphaville on the question of fraud on the USPTO, Knoll fails to show as a matter of law that it did not commit fraud on the USPTO. Materiality and intent are questions of

---

[58] Linda K. McLeod & Stephanie H. Bald, *Ethical Issues in U.S. Trademark Prosecution & TTAB Practice*, 10 J. MARSHALL REV. INTELL. PROP. L. 365 (2011).
[59] These material misrepresentations made by Knoll to TTAB were explicitly enumerated in the Alphaville summary judgment decision. *Id.* at 16.

fact. While suitable for a jury determination, they are not suitable for summary judgment on this record. Accordingly, except as described above, Knoll's cross-motion for partial summary judgment is DENIED."[60]

Judge Patel's ruling is strong evidence that Knoll's claim of having an absolute right to the Barcelona furniture is invalid, as material issues of law and fact exist which can invalidate Knoll's rights towards its fraudulently acquired trademarks.

38)     Moreover, the Seventh Circuit has already decided a case nearly identical to this one. In *Specialized Seating, Inc. v. Greenwich Industries, LP*, 616 F.3d 722 (7th Cir. 2010), Greenwich Industries had been making x-frame folding chairs for more than 80 years. In 1999, Greenwich applied for registration of one particular design as a trademark, and a trademark registration issued in 2004 to the mark. After a Greenwich employee left the company and joined *Specialized Seating* in 2001, Specialized began selling a folding chair that looked like Greenwich's trademarked chair. That similarity of design resulted in Specialized seeking a declaratory judgment that its design did not violate Greenwich's trademark rights. As Greenwich had been using its trademark in commerce for more than five years, its registration had obtained "incontestable" status. During a bench trial, Specialized asserted that Greenwich's registration had been obtained fraudulently, as Greenwich had omitted to mention to the USPTO the existence of expired patents on the chair and that the mark was functional. Ultimately, the district court ruled in Specialized's favor, finding (1) that Greenwich had defrauded the Patent and Trademark Office by giving "misleadingly incomplete" answers to the trademark examining attorney's questions and (2) that both Greenwich's overall design and each feature of its design were functional.[61] In affirming the lower court's decision, the Seventh Circuit cited the Supreme Court's ruling in *Traffix*, which stands for the proposition that the claims in an expired utility

---

[60] *Id.* at 16.
[61] *Specialized Seating, Inc. v. Greenwich Industries, L.P.*, 616 F.3d 722 (7th Cir. 2010).

patent are presumptively functional.[62] The court continued that, "since inventions covered by utility patents pass into public domain when the patent expires, it is inappropriate to use trademark law to afford extended protection to the patented invention."[63]

## DEFENDANTS EXERCISED DUE DILIGENCE BEFORE COMMENCING SALE OF BARCELONA FURNITURE

39)     The Defendants conducted an extensive legal search before commencing the sale of Barcelona furniture. In 2004, *The New York Times* published an article stating, "David Harrison, a trademark lawyer at Rosen & Livingston in New York who represents C.I.T.E., argues that after 75 years the design for the Barcelona chair is in the public domain. Knoll can do little more than 'make a lot of noise,' he said."[64]

## KNOLL HAS REPEATEDLY TRIED TO DEFEAT ANY ADVERSARIES BY MANIPULATING THE LEGAL PROCESS RATHER THAN LITIGATING ON THE MERITS OF THE CASE

40)     Knoll's actions illustrate an intentional effort to manipulate the legal system. Knoll also has not explained why it only applied for a trademark on the Barcelona furniture in 2003, after a gap of 56 years from originally acquiring alleged "production rights" from Mies in 1953. The answer seems to lie in the fact that in 2000, the Supreme Court of the United States further clarified the dislike our great nation possesses for product configuration trademarks[65] by

---

[62] *Id.* ("The district judge started from the proposition, which the Supreme Court articulated in TrafFix, that claims in an expired utility patent presumptively are functional. Since utility patents are supposed to be restricted to inventions that have utility, and thus are functional, that's a sensible starting point—and since inventions covered by utility patents pass into the public domain when the patent expires, it is inappropriate to use trademark law to afford extended protection to a patented invention. (*See also* Jay Franco, 615 F.3d at 857–59. 5–8 … .) This means that the trademark design is functional as a unit, and that every important aspect of it is independently functional. It looks the way it does in order to be a better chair, not in order to be a better way of identifying who made it (the function of a trademark).").

[63] *Id.*

[64] Ernest Beck, *Knocking Off the Knockoffs*, N.Y. TIMES, Oct. 28, 2004, http://www.nytimes.com/2004/10/28/garden/28KNOL.htm ("David Harrison, a trademark lawyer at Rosen & Livingston in New York who represents C.I.T.E., argues that after 75 years the design for the Barcelona chair is in the public domain. Knoll can do little more than 'make a lot of noise,' he said.").

[65] *See, e.g.*, Andrew F. Halaby, *The Trickiest Problem with Functionality Revisited: A Datum Prompts a Thought Experiment*, 63 N.Y.U. ANN. SURV. AM. L. 151 (2007); Timothy M. Barber, *High Court Takes Right Turn in TrafFix, But Stops Short of the Finish Line: An Economic Critique of Trade Dress Protection for Product Configuration*, 7 MARQ. INTELL. PROP. L. REV. 259 (2003).

holding that the distinctiveness, an essential characteristic necessary for obtaining a trademark, could not be established just by the uniqueness of a product design, but must be established via showing secondary meaning, no matter how unique the design in question might be. *See Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 212, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000). Legal scholars have commented that the Supreme Court wanted to make it extremely difficult for people to acquire product configuration trademarks, since from the time a product hits the market to the time when it acquires secondary meaning, several competitors would have entered the market, preventing the product being attributed to a single source or acquiring secondary meaning.[66] However, a misleading or tenuous interpretation of *Samara* enabled Knoll to acquire its current trademarks. Knoll misrepresented to the USPTO that the Barcelona chair had acquired secondary meaning (as originating solely from Knoll),[67] that no utility patents existed on the Barcelona furniture, and the public had come to associate the historically recognized Barcelona furniture as coming only from Knoll.[54] The falsity of all of these claims has been proven in *Alphaville Design, Inc. v. Knoll, Inc.*, 627 F.Supp.2d 1121 (N.D. Cal. 2009). This trademark application is a fine example of legal manipulation, but should not be allowed to violate the soul and intent of trademark law or encourage lawyers to make misrepresentations to judicial and administrative tribunals.

---

[66] *See* Joseph J. Ferretti, *Product Design Trade Dress Hits the Wall ... Mart: Wal-Mart v. Samara Brothers*, 42 IDEA 417, 449 (2002). ("[T]he effect Wal-Mart has on the intellectual property rights of businesses attempting to establish trade dress protection for their product design; as the Court's "pro-competitive" decision creates a situation where it is possible that the requisite secondary meaning can never be established by the owner of a unique product design because competitors can freely copy unique designs early in the product's life, thus preventing the establishment of secondary meaning."); Tahj Gomes & Carla DeSilva, *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.: The Supreme Court Steps Back from Two Pesos and Requires Secondary Meaning in All Product Design Trade Dress Cases*, 17 SANTA CLARA COMPUTER & HIGH TECH. L.J. 365, 370 (2001) ("The United States Supreme Court unanimously held in the case of Wal-Mart Stores, Inc. v. Samara Brothers, Inc., that product designs are not inherently distinctive and therefore cannot be protected as unregistered trade dress under Section 43(a) of the Lanham Act unless and until the product design has developed "secondary meaning" in the mind of the public.").
[67] *Id.* at 16.

41)     In all cases involving the Barcelona furniture, Knoll did not litigate on the merits of the case but settled before the cases were decided on merits.[68] In the case at bar, Knoll has lost its ability to get an injunction against the Defendants, as the Plaintiff had actual and constructive notice of Defendants' sale of Barcelona furniture for more than the requisite period as mandated by the Second Circuit.[69] Hence, Knoll is again trying to manipulate the system to achieve a functional equivalent of an injunction by tortuously interfering with the contractual relationships of the Defendants.

42)     Knoll acts in extreme bad faith in attempting to shut down the Defendants' websites on the Friday before each long holiday, actions which are intended to incapacitate the Defendants from obtaining any judicial relief due to official court holidays. The Defendants are a small company with limited resources. Knoll is trying to choke the Defendants' lifeline in order to end the Defendants' ability to litigate on the merits of this case.

43)     In the case at bar, Knoll wants the court to believe that anyone with deep pockets can acquire "fictional or production rights" in a popular public domain item: spend substantial sums of money in legal expenses; sponsor a marketing campaign for five years; and thereafter, achieve an incontestable trademark. This pattern of manipulative legal behavior is alarming and should be restrained. Hence, Knoll should not be allowed to have legally exclusive rights to a product which has been in the public domain for decades.

---

[68] A search on PACER Reveal more than 10 cases filed by Knoll or against Knoll regarding the Barcelona trademarks. All of these lawsuits have settled before they could be litigated on the merits of the case.

[69] *See Citibank, N.A. & Citicorp v. Citytrust & Citytrust Bancorp, Inc*., 756 F.2d 273, 276-77 (2d Cir. 1985) ("We have found delays of as little as ten weeks sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction."); *Weight Watchers Int'l, Inc. v. Luigino's, Inc*., 423 F.3d 137, 144 (2d Cir. 2005) (Plaintiffs litigating in the Second Circuit should move for preliminary injunctive relief within three months of actual or constructive notice of the infringement (or actionable expansion of infringement) in order to be confident of establishing the element of irreparable harm.).

44)    For example, consider the product configuration of best selling generic medicinal drug Aspirin. The product configuration of an individual particle (molecule) of Aspirin is illustrated in Figure 2A.



Figure 2A.

The expiration of American patent on Aspirin in 1917 has enabled unlicensed generic production of Aspirin worldwide. Bayer AG has been historically the largest manufacturer of Aspirin. If Knoll's legal reasoning is to be believed, Bayer, as the largest producer of aspirin, can claim that for past five years the public has come to associate Aspirin's product configuration illustrated in Figure 2A as coming from Bayer in large part and hence has acquired secondary meaning. Following Knoll's legal reasoning, this would allow Bayer to acquire incontestable trademarks on the product configuration represented in Figure 2A. This incontestable trademark would then allow Bayer to prevent, through perpetuity, any generic manufacturer from manufacturing Aspirin under the threat of a trademark infringement lawsuit. This legal interpretation would throw the regime of U.S. patent and trademark law into an eternal tailspin while raising the prices of generic drugs exponentially. It is precisely for this reason that legal scholars have asserted that trade dress protection in the entire product is unconstitutional.[70] The

---

[70] "In my view, whatever new law has been developed in the lower courts to authorize the use of product configuration trademarks as a substitute for design patents is without sanction from the Supreme Court. The Court has spoken repeatedly to disfavor the use of unfair competition law to avoid the "limited times" provision of the Patent Clause. The Court has emphasized the importance of the right to copy as an aspect of the Patent Clause. The right to copy is constitutionally protected and is absolutely essential to the successful long-term operation of a free and competitive economy. I therefore respectfully dissent." *Kohler Co. v. Moen Inc*., 12 F.3d 632, 638 (7th Cir.1993).

Supreme Court has made clear that the patent monopoly which may be secured by obtaining a

design patent on a product may not be indefinitely extended through the use of a federal

trademark on the product configuration. *Scott Paper Co. v. Marcalus Mfg. Co.,* 326 U.S. 249, 66

S.Ct. 101, 90 L.Ed. 47 (1945). "Since inventions covered by utility patents pass into public

domain when the patent expires, it is inappropriate to use trademark law to afford extended

protection to the patented invention." *Specialized Seating, Inc. v. Greenwich Industries, L.P.,* 616

F.3d 722 (7th Cir. 2010).

### HISTORY OF KNOLL'S BAD FAITH MANIPULATION TO ACHIEVE INCONTESTABILITY OF TRADEMARKS

45)     On information and belief, Counter-Defendant has filed at least 22 lawsuits

against small business that produced the Barcelona Collection.  Three of those lawsuits are

ongoing, all appearing before this court, including this lawsuit.  Of the 19 prior lawsuits the

Counter-Defendant filed, none of them were litigated on the merits.  In addition, two declaratory

judgment lawsuits were filed against Counter-Defendant, but again, neither lawsuit went to trial.

46)     On information and belief, Knoll filed for incontestability for the Barcelona

Collection trademarks in April and May 2010.  In the three months prior to filing those affidavits

(February to April, 2010), Counter-Defendant Knoll voluntarily dismissed six pending lawsuits

regarding the Barcelona Collection trademarks.  An affidavit of incontestability requires the

trademark holder to swear, under oath, that no final adverse decision has been entered against it,

and that there are no currently pending proceedings in a court involving the claimed rights. 15

USC §1065.  Thus, Counter-Defendant Knoll dismissed six lawsuits so that it could file for

incontestable status. Upon achieving incontestability, certain defenses are not available to

defendants in a trademark infringement action.

47)    By voluntarily dismissing the six pending lawsuits regarding the Barcelona Collection in the three months before filing for incontestable status, Knoll manipulated the Patent and Trademark Office to acquire incontestability status of Knoll's Barcelona Collection trademarks.  Upon achieving incontestability in five years, certain defenses are not available to defendants against a trademark infringement action.[71] If Knoll was not aware that it was using a tenuous interpretation of trademark law, then Knoll should have pursued all alleged infringers with equal zeal, regardless of whether or not the trademarks had achieved incontestable status. It is clear Knoll has been violating the intent of the Lanham Act and manipulating the legal system.

48)    Knoll has continued to manipulate courts, including this Court, by filing actions using its incontestable trademark status since the Patent and Trademark Office granted the Barcelona Collection trademarks incontestable status.  On information and belief, Knoll has cited its incontestable status as proof that its trademark is valid, and has implied that no defense can be raised against its trademark because of the incontestable status.  However, there are 21 defenses available to a defendant facing an incontestable trademark.[72]  By misrepresenting its legal position before this Court, and other courts, Knoll has shown bad faith.

### KNOLL'S BAD FAITH ACTIONS IN THIS CASE

49)    After settlement negotiations failed in this case, when only 10 days remained to finish discovery, Counter-Defendant Knoll objected to an extension of the Discovery deadline, though it knew that it had not produced a substantial amount of documents, and no depositions

---

[71] See also Kenneth L. Port, *The Illegitimacy of Trademark Incontestability*, 26 IND. L. REV. 519, 554 (1993).

[72] Stevens Dissent, *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 208 (1985) (Stevens, J., dissenting). "Section 33(b) enumerates seven categories of defenses to an action to enforce an incontestable mark. See 15 U. S. C. § 1115(b), quoted *ante,* at 194, **n**. 3. In addition, a defendant is free to argue that a mark should never have become incontestable for any of the four reasons enumerated in § 15. 15 U. S. C. § 1065. Moreover, § 15 expressly provides that an incontestable mark may be challenged on any of the grounds set forth in subsections (c) and (e) of § 14, 15 U. S. C. § 1064, and those sections, in turn, incorporate the objections to registrability that are defined in §§ 2(a), 2(b), and 2(c) of the Act. 15 U. S. C. §§ 1052(a), (b), and (c)."

had been taken.  Counter-Defendant Knoll then filed a Summary Judgment motion, even though discovery had not been finished.

50)     This Court, on May 18, 2012, issued an order extending discovery to June 30, 2012, and dismissing Counter-Defendant Knoll's Summary Judgment motion without prejudice as premature.

51)     Five days later, on May 23, 2012, Counter-Defendant sent a letter to the internet service provider (ISP) GoDaddy.com, that was hosting Counter-Plaintiffs' Regencyshop.com website.  Counter-Defendant asked GoDaddy.com to remove select pages of the Counter-Plaintiffs' Regencyshop.com website, which pages the Counter-Defendant claimed were infringing their trademarks. In response, GoDaddy.com shut down the Counter-Plaintiff's entire website.

52)     On information and belief, Counter-Defendant sent the letter with the intent to shut down Defendants' entire website, and not as the letter claim, merely a few pages of the website.[73]  Upon information and belief, Counter-Defendant Knoll knew that submitting a trademark infringement letter regarding select pages of the Counter-Plaintiffs' website would cause GoDaddy.com to take down the entire website, because it is GoDaddy.com's policy to do so, as stated on GoDaddy.com' website.

53)     Counter-Defendant Knoll had notified the ISP at the outset of litigation regarding the trademark infringement claim, however, a mere five days after Counter-Defendant had its Summary Judgment motion struck, and discovery extended over its objections, it filed another trademark infringement notice.  Notably, Counter-Defendant filed the trademark infringement

---

[73] The sales of the Barcelona furniture through the Regencyshop.com website only amounts to less than twenty percent of the total sales by the website.

letter right before a three day weekend, limiting Counter-Plaintiffs' ability to remedy the situation with GoDaddy.com.

54)     When Counter-Plaintiff was notified that its entire website was shut down, counsel for Counter-Plaintiff contacted Counter-Defendant's counsel, asking that they reiterate to GoDaddy.com that only select pages were to be taken down, not the entire website.  Counsel for Counter-Defendant responded by contacting counsel for Counter-Plaintiff, and stating that they would not comply with Counter-Plaintiff's request.

55)     After unsuccessfully trying to negotiate with GoDaddy.com to have the portions of the website that were not cited in the trademark infringement letter reinstated, which amount to the vast majority of Counter-Plaintiffs' website, Counter-Plaintiffs contracted with the ISP Hostgator.com to have Hostgator.com host the Regencyshop.com website.

56)     Counter-Plaintiff's website Regencyshop.com was shut down, and not accessible by internet users for only one day, however, it took four days for the number of customers visiting the website to return to normal levels.  Counter-Plaintiffs lost over $6,500 in lost sales and other damages.

57)     On May 27, 2012, Counter-Defendant Knoll sent another trademark infringement letter to the ISP Hostgator.com regarding Counter-Plaintiffs' website EleganceCode.com. Hostgator.com then shut down Counter-Plaintiffs' entire website for a total of three days. Counter-Plaintiffs lost a total of about $500 in lost sales and other damages because the website Elegancecode.com was down.  Hostgator.com reinstated Counter-Plaintiffs' website after Counter-Plaintiffs' sent a letter to Hostgator.com, stating that the matter was in litigation before this Court.

58)     On or about June 28, 2012, Counter-Defendant, only a few days after this Court extended discovery until August 31, 2012, Counter-Defendant sent a trademark infringement letter to the ISP Hostgator.com regarding Counter-Plaintiffs' websites Regencyshop.com and EleganceCode.com.  Hostgator.com refused to shut down Counter-Plaintiffs' websites, stating that the matter was in litigation before this Court.

59)     Counter-Defendant Knoll has never attempted to obtain a preliminary injunction to halt the sale of the allegedly infringing products during the course of this litigation.  Rather, Counter-Defendant Knoll has repeatedly sent letters to the ISPs hosting Counter-Plaintiffs' websites in an attempt to hurt Counter-Plaintiffs and cause Counter-Plaintiffs to go out of business and lose the resources to litigate the case before this Court.

## COUNT I
### (Tortious Interference with Contract)

60)     Counter-Plaintiffs incorporate each of the allegations set forth in paragraphs 1 through 59, as though fully set forth and repeated herein.

61)     Counter-Plaintiffs entered into a contract with the ISP GoDaddy.com, to provide Counter-Plaintiffs with web hosting services for Counter-Plaintiffs' website Regencyshop.com.

62)     On information and belief, Counter-Defendant Knoll knew about the said contract between Counter-Plaintiffs and GoDaddy.com.

63)     On information and belief, Counter-Defendant Knoll sent a letter on May 25, 2012, to GoDaddy.com, alleging that Counter-Plaintiffs were in violation of Counter-Defendant Knoll's trademarks.  On information and belief, Counter-Defendant Knoll sent the letter in an attempt to cause GoDaddy.com to terminate its hosting services of Counter-Plaintiffs' entire Regencyshop.com website, not merely the pages of the website that contained the allegedly infringing products.

24

64)     On information and belief, Counter-Defendant sent the letter, not in a good faith attempt to police its trademark rights, but in an attempt to cause Counter-Plaintiffs to lose their financial support, and cause Counter-Plaintiffs to be forced to cease litigating the lawsuit before this Court.

65)     GoDaddy.com did cease providing hosting services of Counter-Plaintiffs' Regencyshop.com website on May 26, 2012.

66)     As a result of GoDaddy.com's breach, Counter-Plaintiffs were damaged in the amount exceeding $6,500.

### COUNT II
### (Tortious Interference with Contract)

67)     Counter-Plaintiffs incorporate each of the allegations set forth in paragraphs 1 through 66, as though fully set forth and repeated herein.

68)     Counter-Plaintiffs entered into a contract with the ISP Hostgator.com, to provide Counter-Plaintiffs with web hosting services for Counter-Plaintiffs' website EleganceCode.com.

69)     On information and belief, Counter-Defendant Knoll knew about the said contract between Counter-Plaintiffs and Hostgator.com.

70)     On information and belief, Counter-Defendant Knoll sent a letter on or about May 27, 2012, to Hostgator.com, alleging that Counter-Plaintiffs were in violation of Counter-Defendant Knoll's trademarks.  On information and belief, Counter-Defendant Knoll sent the letter in an attempt to cause HostGator.com to terminate its hosting services of Counter-Plaintiffs' entire EleganceCode.com website, not merely the pages of the website containing the allegedly infringing products.

71)     On information and belief, Counter-Defendant sent the letter, not in a good faith attempt to police its trademark rights, but in an attempt to cause Counter-Plaintiffs to lose their

financial support, and cause Counter-Plaintiffs to be forced to cease litigating the lawsuit before this Court.

72)     Hostgator.com did cease providing hosting services of Counter-Plaintiffs' Regencyshop.com website for a period of three days.

73)     As a result of Hostgator.com's breach, Counter-Plaintiffs have been damaged in the amount of $500.

**COUNT III**
**(Tortious Interference with Prospective Business Relations)**

74)     Counter-Plaintiffs incorporate each of the allegations set forth in paragraphs 1 through 73, as though fully set forth and repeated herein.

75)     Counter-Plaintiffs operate the website Regencyshop.com.

76)     On information and belief, Counter-Defendant Knoll knew that Counter-Plaintiffs operated the Regencyshop.com website.

77)     On information and belief, Counter-Defendant Knoll caused Counter-Plaintiffs' Regencycode.com website to be inaccessible to Counter-Plaintiffs' customers by sending a letter to Counter-Plaintiffs' ISP, GoDaddy.com alleging that Counter-Plaintiffs' website violated Counter-Defendant Knoll's trademarks.  As a result of that letter, GoDaddy.com terminated its web hosting services of the website Regencyshop.com.  The website Regencyshop.com was inaccessible for a total of one day before Counter-Defendants were able to secure new web hosting services at Hostgator.com.

78)     Counter-Plaintiffs' customers called Counter-Plaintiffs to complain that the website was down.  Customers that would have done business with Counter-Plaintiffs failed to enter into contracts with Counter-Plaintiffs.  For the four days after the website

Regencyshop.com was again available to customers, the number of sales made through the website was lower than the normal number of sales.

79)     If Counter-Defendant Knoll had not caused Counter-Plaintiffs' website to be inaccessible to Counter-Plaintiffs' customers, said customers would have entered into contracts with Counter-Plaintiffs.

80)     On information and belief, Counter-Defendant Knoll sent the letter to GoDaddy.com with the intent to cause Counter-Plaintiffs entire website to be shut down to harm Counter-Plaintiffs, not in a good faith attempt to police its trademarks.

81)     On information and belief, Counter-Defendant Knoll acted with the sole purpose of causing Counter-Plaintiff to lose their financial support, and cause Counter-Plaintiffs to be forced to cease litigating the lawsuit before this Court.

82)     As a result of Counter-Defendant Knoll's actions, Counter-Plaintiffs have been damaged in the amount over $6,500.

### COUNT IV
### (Prima Facie Tort)

83)     Counter-Plaintiffs incorporate each of the allegations set forth in paragraphs 1 through 82, as though fully set forth and repeated herein.

84)     On information and belief, Counter-Defendant acted intentionally to inflict harm upon Counter-Plaintiffs by sending letters dated on or about May 25, 2012, May 27, 2012, and June 28, 2012, to the ISPs GoDaddy.com and Hostgator.com, which ISPs were hosting Counter-Plaintiffs' websites Regencycode.com and EleganceCode.com.  The letters alleged that Counter-Plaintiffs' websites Regencycode.com and EleganceCode.com violated Counter-Defendant Knoll's trademarks.  As a result of the letters, both GoDaddy.com and Hostgator.com terminated

their web hosting services of Counter-Plaintiffs' website Regencycode.com and EleganceCode.com.

85) As a result of the termination of the web hosting services of Counter-Plaintiffs' website Regencycode.com, Counter-Plaintiffs' website Regencycode.com and ElegeanceCode.com were inaccessible to Counter-Plaintiffs' customers.  As a result of Counter-Plaintiffs' website Regencycode.com being inaccessible to Counter-Plaintiffs' customers, Counter-Plaintiffs' have been damaged in an amount over $7,000.

### COUNT V
### (Declaratory Judgment that the Trademarks are Functional)

86) Counter-Plaintiffs incorporate each of the allegations set forth in paragraphs 1 through 85, as though fully set forth and repeated herein.

87) The Barcelona Collection was subject to utility patents in the United States (No. 2,283,755), Germany (Patentschrift Nr. 486722), and Spain.[74]  As previously patented objects, the Barcelona Collection is functional.

88) Plaintiff does not have valid trademarks in the designs of the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, and the Flat Brno Chair because the design of those furniture pieces are functional.

89) The following trademark registrations issued to Plaintiff should be cancelled because they are functional:

Registration No. 2,893,025 is for the configuration Barcelona chair.

Registration No, 2,894,977 is for the configuration Barcelona ottoman.

Registration No. 2,894,980 is for the configuration Barcelona couch.

---

[74] *Alphaville Design, Inc. v. Knoll, Inc.*, 627 F. Supp. 2d 1121, 1125 (N.D. Cal. 2009).

Registration No. 2,894,979 is for the configuration Barcelona table.

Registration No. 2,894,978 is for the configuration of Brno chair.

Registration No. 772,313, for the BARCELONA word mark.

## COUNT VI
### (Declaratory Judgment that the Trademarks are Aesthetically Functional)

90)      Counter-Plaintiffs incorporate each of the allegations set forth in paragraphs 1 through 89, as though fully set forth and repeated herein.

91)      The design of the pieces of the Barcelona Collection is aesthetically pleasing.

92)      On information and belief, customers primarily choose to purchase the Barcelona Collection because of the pleasing aesthetic properties of the Barcelona Collection.

93)      Plaintiff does not have valid trademarks in the designs of the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, and the Flat Brno Chair because the design of those furniture pieces are aesthetically functional.

94)      The following trademark registrations issued to Plaintiff should be cancelled because they are aesthetically functional:

Registration No. 2,893,025 is for the configuration Barcelona chair.

Registration No, 2,894,977 is for the configuration Barcelona ottoman.

Registration No. 2,894,980 is for the configuration Barcelona couch.

Registration No. 2,894,979 is for the configuration Barcelona table.

Registration No. 2,894,978 is for the configuration of Brno chair.

Registration No. 772,313, for the BARCELONA word mark.

<u>COUNT VII</u>
**(Declaratory Judgment for that the Trademarks are Generic)**

95)     Counter-Plaintiffs incorporate each of the allegations set forth in paragraphs 1 through 94, as though fully set forth and repeated herein.

96)     On information and belief, the term BARCELONA has become generic as an indication of modern furniture similar to the furniture designed by Ludwig Mies van der Rohe and Lillian Reich.

97)     On information and belief, the Barcelona Collection has become generic as a type of modern furniture.

98)     Plaintiff does not have valid trademarks in the designs of the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, Flat Brno Chair and the BARCELONA word mark as these product configuration trademarks and word mark are generic descriptors for furniture from the modern movement. The designs of the Barcelona Collection and the BARCELONA name have become general indications of the product class rather than a specific indication of source.

99)     The following trademark registrations issued to Plaintiff should be cancelled because the following trademarks have become a general indication of a product class rather than a specific product or service.

Registration No. 2,893,025 is for the configuration Barcelona chair.

Registration No, 2,894,977 is for the configuration Barcelona ottoman.

Registration No. 2,894,980 is for the configuration Barcelona couch.

Registration No. 2,894,979 is for the configuration Barcelona table.

Registration No. 2,894,978 is for the configuration of Brno chair.

Registration No. 772,313, for the BARCELONA word mark.

<u>COUNT VIII</u>
**(Declaratory Judgment that the trademarks have been Abandoned)**

100)     Counter-Plaintiffs incorporate each of the allegations set forth in paragraphs 1 through 99, as though fully set forth and repeated herein.

101)     On information and belief, Knoll has entered into licensing agreements with at least 15 parties to allow said parties to produce and sell the Barcelona Collection.  On information and belief, Knoll has entered into multiple settlement agreements with different defendants across the country over the last ten years, however, the settlement licensing agreements contain no provision for quality control for aforementioned furniture in dispute.

102)     On information and belief, the licenses are naked licenses, and Knoll does not police the quality of the Barcelona Collection produced by the licensees.

103)     Because Knoll has entered into naked licensing, Knoll has abandoned any trademark rights it has in the Barcelona Collection, and is estopped from asserting any trademark rights in the Barcelona Collection.

104)     The following trademark registrations issued to Plaintiff should be cancelled because they have been abandoned by the Plaintiff owing to Plaintiffs multiple naked licensing agreements which list no provision for quality control.

Registration No. 2,893,025 is for the configuration Barcelona chair.

Registration No, 2,894,977 is for the configuration Barcelona ottoman.

Registration No. 2,894,980 is for the configuration Barcelona couch.

Registration No. 2,894,979 is for the configuration Barcelona table.

Registration No. 2,894,978 is for the configuration of Brno chair.

Registration No. 772,313, for the BARCELONA word mark.

<u>COUNT IX</u>
**(Declaratory Judgment that the Trademarks were Registered through
Fraud on the Patent and Trademark Office)**

105)     Counter-Plaintiffs incorporate each of the allegations set forth in paragraphs 1

through 104, as though fully set forth and repeated herein.

106)     On information and belief, in each application for the registration of the product

designs at issue, Plaintiff made the following statement: "The mark has become distinctive by

reason of substantially exclusive and continuous use in interstate commerce by applicant and its

predecessor in interest as to the rights herein claimed in connection with the goods listed in the

application for at least five (5) years preceding the date of this application (emphasis added)."

The applications were filed on October 22, 2003.

107)     On information and belief, in the Declaration supporting each application for the

registration of its product designs at issue, Carl G. Magnusson, Executive Vice President and

Director of Design of Plaintiff, stated the following: "[t]hat to the best of my knowledge and

belief, no other person, firm, corporation or association has the right to use said mark in

commerce." The Declarations were signed on September 30, 2003.

108)     On information and belief, at the time the aforementioned Declarations were

signed and the aforementioned applications were filed, there was extensive third-party usage of

the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, and Flat Brno Chair

designs.

109)     On information and belief, at the time the aforementioned Declarations were

signed and the aforementioned applications were filed, Plaintiff knew, or reasonably should have

known, that there was extensive third-party usage of the Barcelona Chair, Barcelona Stool,

Barcelona Couch, Barcelona Table, and Flat Brno Chair designs.

110)    On information and belief, the aforementioned third-parties had the legal rights to manufacture, import, sell, offer for sale, advertise and distribute the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, and Flat Brno Chair designs.

111)    On information and belief, Plaintiff knew, or reasonably should have known, that the third parties had rights that were at least equivalent to those of plaintiff to manufacture, import, sell, offer for sale, advertise and distribute the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, and Flat Brno Chair and had no reasonable basis for believing otherwise.

112)    On information and belief, Knoll also fraudulently stated to the PTO that the Designs were not subject to patent protection or applications. On information, and belief, in his declarations in support of Knoll's Design applications, Mr. Magnusson stated that the Designs were not subject to any patent protection or application.  On information and belief, this statement was known by Mr. Magnusson to be misleading and that several patents were relevant and material to the PTO's decision to issue the registrations. Thus, the misrepresentation was both knowing and material.

113)    In failing to disclose to the United States Patent and Trademark Office those third parties, as well as Defendant, with rights equivalent to those of Plaintiff to manufacture, import, sell, offer for sale, advertise and distribute the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, and Flat Brno Chair, Plaintiff made a material misrepresentation-by-omission that was intended to procure trademark registrations to which Plaintiff was not entitled.

114)    In failing to disclose to the United States Patent and Trademark Office existence of three utility patents in  the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona

Table, and Flat Brno Chair, Plaintiff made a material misrepresentation-by-omission that was intended to procure trademark registrations to which Plaintiff was not entitled.

115)    The following trademark registrations issued to Plaintiff are invalid because they were obtained as a result of knowingly false and material misrepresentations made by the Plaintiff during the prosecution of its trademark applications.

Registration No. 2,893,025 is for the configuration Barcelona chair.

Registration No, 2,894,977 is for the configuration Barcelona ottoman.

Registration No. 2,894,980 is for the configuration Barcelona couch.

Registration No. 2,894,979 is for the configuration Barcelona table.

Registration No. 2,894,978 is for the configuration of Brno chair.

Registration No. 772,313, for the BARCELONA word mark.

### COUNT X
### (Declaratory Judgment that the Trademarks violate Article 1 Section 8 of the United States Constitution)

116)    Counter-Plaintiffs incorporate each of the allegations set forth in paragraphs 1 through 115, as though fully set forth and repeated herein.

117)    The Barcelona Collection was subject to patents [patent details].

118)    The patents over the Barcelona collection expired decades before Knoll acquired any rights from Mies.

119)    Counter-Defendant Knoll sought to extend the patent protection over the Barcelona Collection by filing for trademarks over the design of the Barcelona Collection, and then using those trademarks to prohibit other manufactures of the Barcelona Collection from producing the Barcelona Collection.

120)     Counter-Defendant Knoll's actions are in violation of the requirement of Article 1 Section 8 of the United States Constitution that patent protection be for a limited time, as trademark protection is indefinite.

121)     The following trademark registrations issued to Plaintiff should be declared invalid, and cancelled, because the registrations violate Article 1 Section 8 of the United States Constitution:

Registration No. 2,893,025 is for the configuration Barcelona chair.

Registration No, 2,894,977 is for the configuration Barcelona ottoman.

Registration No. 2,894,980 is for the configuration Barcelona couch.

Registration No. 2,894,979 is for the configuration Barcelona table.

Registration No. 2,894,978 is for the configuration of Brno chair.

Registration No. 772,313, for the BARCELONA word mark.

### COUNT XI
**(Damages for Fraudulent Registration)**

122)     Counter-Plaintiffs incorporate each of the allegations set forth in paragraphs 1 through 121, as though fully set forth and repeated herein.

123)     On information and belief, in each application for the registration of the product designs at issue, Plaintiff made the following statement: "The mark has become distinctive by reason of substantially exclusive and continuous use in interstate commerce by applicant and its predecessor in interest as to the rights herein claimed in connection with the goods listed in the application for at least five (5) years preceding the date of this application (emphasis added)." The applications were filed on October 22, 2003.

124)     On information and belief, in the Declaration supporting each application for the registration of its product designs at issue, Carl G. Magnusson, Executive Vice President and

Director of Design of Plaintiff, stated the following: "[t]hat to the best of my knowledge and belief, no other person, firm, corporation or association has the right to use said mark in commerce." The Declarations were signed on September 30, 2003.

125)   On information and belief, at the time the aforementioned Declarations were signed and the aforementioned applications were filed, there was extensive third-party usage of the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, and Flat Brno Chair designs.

126)   On information and belief, at the time the aforementioned Declarations were signed and the aforementioned applications were filed, Plaintiff knew, or reasonably should have known, that there was extensive third-party usage of the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, and Flat Brno Chair designs.

127)   On information and belief, the aforementioned third-parties had the legal rights to manufacture, import, sell, offer for sale, advertise and distribute the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, and Flat Brno Chair designs.

128)   On information and belief, Plaintiff knew, or reasonably should have known, that the third parties had rights that were at least equivalent to those of plaintiff to manufacture, import, sell, offer for sale, advertise and distribute the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, and Flat Brno Chair and had no reasonable basis for believing otherwise.

129)   On information and belief, Knoll also fraudulently stated to the PTO that the Designs were not subject to patent protection or applications. On information, and belief, in his declarations in support of Knoll's Design applications, Mr. Magnusson stated that the Designs were not subject to any patent protection or application.  On information and belief, this

statement was known by Mr. Magnusson to be misleading and that several patents were relevant and material to the PTO's decision to issue the registrations. Thus, the misrepresentation was both knowing and material.

130)    In failing to disclose to the United States Patent and Trademark Office those third parties, as well as Defendant, with rights equivalent to those of Plaintiff to manufacture, import, sell, offer for sale, advertise and distribute the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, and Flat Brno Chair, Plaintiff made a material misrepresentation-by-omission that was intended to procure trademark registrations to which Plaintiff was not entitled.

131)    In failing to disclose to the United States Patent and Trademark Office existence of three utility patents in  the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, and Flat Brno Chair, Plaintiff made a material misrepresentation-by-omission that was intended to procure trademark registrations to which Plaintiff was not entitled.

132)    The following trademark registrations issued to Plaintiff are invalid because they were obtained as a result of knowingly false and material misrepresentations made by the Plaintiff during the prosecution of its trademark applications.

Registration No. 2,893,025 is for the configuration Barcelona chair.

Registration No, 2,894,977 is for the configuration Barcelona ottoman.

Registration No. 2,894,980 is for the configuration Barcelona couch.

Registration No. 2,894,979 is for the configuration Barcelona table.

Registration No. 2,894,978 is for the configuration of Brno chair.

Registration No. 772,313, for the BARCELONA word mark.

133)    On information and belief, Counter-Defendant acted intentionally to inflict harm upon Counter-Plaintiffs by sending letters dated on or about May 25, 2012, May 27, 2012 and

June 28, 2012, to the ISPs GoDaddy.com and Hostgator.com, which ISPs were hosting Counter-Plaintiffs' websites Regencyshop.com and EleganceCode.com.  The letters alleged that Counter-Plaintiffs' website Regencyshop.com  and EleganceCode.com violated Counter-Defendant Knoll's trademarks.  These trademarks were obtained fraudulently.

134)    As a result of the letters, both GoDaddy.com and Hostgator.com terminated their web hosting services of Counter-Plaintiffs' websites Regencyshop.com and EleganceCode.com.

135)    As a result of the termination of the web hosting services of Counter-Plaintiffs' website Regencyshop.com and EleganceCode.com, Counter-Plaintiffs were damaged in an amount in excess of $7,000.

136)    As a result of the fraudulent registration of the Counter-Defendant Knoll's trademarks, and the filing of a case before this Court against Counter-Plaintiff to enforce those fraudulently registered trademarks, Counter-Plaintiff has been damaged in the amount in excess of $100,000.

### PRAYER FOR RELIEF

WHEREFORE, Defendants respectfully pray that the Court enter judgment as follows:

(a) find that the trademarks, numbers 2,893,025 (Barcelona Chair), 2,894,977 (Barcelona Stool), 2,894,980 (Barcelona Couch), 2,894,979 (Barcelona Table), 2,894,978 (Flat Brno Chair), and 772,313 (BARCELONA word mark), are invalid and should be cancelled under the Lanham Act §14(3), 15 USC §1064(3) and Article 1, Section 8 of the United States Constitution;

(b) find that Counter-Defendant Knoll fraudulently registered the trademarks numbers 2,893,025 (Barcelona Chair), 2,894,977 (Barcelona Stool), 2,894,980 (Barcelona Couch), 2,894,979 (Barcelona Table), and 2,894,978 (Flat Brno Chair), 772,313 (BARCELONA word mark);

(c) order Counter-Defendant Knoll to report the fraudulent registration of the trademarks numbers 2,893,025 (Barcelona Chair), 2,894,977 (Barcelona Stool), 2,894,980 (Barcelona Couch), 2,894,979 (Barcelona Table), and 2,894,978 (Flat Brno Chair) to the United States Patent and Trademark Office;

(d) order Counter-Defendant Knoll to pay damages in the amount of $107,000;

(e) order Counter-Defendant Knoll to pay punitive damages for the fraudulent registration of the trademarks numbers 2,893,025 (Barcelona Chair), 2,894,977 (Barcelona Stool), 2,894,980 (Barcelona Couch), 2,894,979 (Barcelona Table), and 772,313 (Barcelona WordMark);

(f) Find that Counter-Plaintiffs have never and are not now offering goods that infringe upon any trademark rights Counter-Defendant claims to own;

(g) Find that Counter-Plaintiffs have never engaged in any action that would threaten, and are not now engaging in any activity that would threaten, Defendants with any harm, including irreparable harm;

(h) Find that the allegedly trademark-protected designs are functional and in the public domain;

(i) Find that any trademark rights in the designs in questions were abandoned by Knoll or a predecessor company;

(j) Knoll shall pay the costs of this action together with Defendants' attorneys' fees; and

(k) Counter-Plaintiffs further pray for such other and further relief as the Court may find just and proper in the premises.

## ANSWER
### Jurisdiction and Venue

1. Defendants admit that Plaintiff has alleged violations of the Lanham Act, New York General Business law and New York common law, but deny that any such violations have occurred by reason of Defendant's conduct, as claimed or implied in Paragraph 1 of the Amended Complaint.

2. Defendants admit that Paragraph 2 alleges that the Court has subject matter over the claims asserted.

### The Parties

3. Defendants admit the allegations set forth in Paragraph 3 of the Amended Complaint.

4. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 4 of the Amended Complaint.

5. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 5 of the Amended Complaint.

6. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 6 of the Amended Complaint.

7. (a) Defendants deny that Moderno, Inc. is now doing any business related to the subject matter of this action.

7.(b) Admitted.

8. Defendants admit that Defendant Mike Saxena resides at the stated address and deny the remainder of the allegation of Paragraph 8 of the Amended Complaint.

9. Moderno, Inc and Urban Mod, Inc conduct business via their website at www.regencyshop.com.

10. Denied.

**Facts Common to All Counts**
**LUDWIG MIES VAN DER ROHE**

11. Defendants lack personal knowledge of the alleged facts.

12. Defendants lack personal knowledge of the alleged facts.

13. Defendants lack personal knowledge of the alleged facts.

**THE GERMAN PAVILION**

14. Defendants lack personal knowledge of the alleged facts.

A. THE BARCELONA CHAIR

15. Defendants deny that Ludwig Mies van der Rohe was the designer of the chair, and aver that Lilly Reich was the designer of the chair.   Defendants admit that architects, the furniture trade and the public have come to generically refer to the style of the stool shown in Paragraph 15 of the Amended Complaint as the "Barcelona Chair," but are without knowledge or information as to whether said architects, the furniture trade and the public refer to the Barcelona Chair by that name because they associate the chair with Knoll.  Defendants aver that the Barcelona Chair has become a generic furniture design.

B. THE BARCELONA STOOL

16. Defendants deny that Ludwig Mies van der Rohe was the designer of the stool, and aver that Lilly Reich was the designer of the stool.   Defendants admit that architects, the furniture trade and the public have come to generically refer to the style of the stool shown in Paragraph 16 of the Amended Complaint as the "Barcelona Stool," but are without knowledge or information as to whether said architects, the furniture trade and the public refer to the Barcelona Stool by that name because they associate the stool with Knoll.  Defendants aver that the Barcelona Stool has become a generic furniture design.

C. THE BARCELONA COUCH

41

17. Defendants deny that Ludwig Mies van der Rohe was the designer of the couch, and aver that Lilly Reich was the designer of the couch.    Defendants admit that architects, the furniture trade and the public have come to generically refer to the style of the stool shown in Paragraph 17 of the Amended Complaint as the "Barcelona Couch," but are without knowledge or information as to whether said architects, the furniture trade and the public refer to the Barcelona Couch by that name because they associate the couch with Knoll.  Defendants aver that the Barcelona Couch has become a generic furniture design.

### THE TUGENDHAT HOUSE

18. Defendants lack personal knowledge of the alleged facts.

### A. THE FLAT BRNO CHAIR

19. Defendants have no personal knowledge as to whether Ludwid Mies van der Rohe designed the Tudendhat House.  Defendants deny that Ludwig Mies van der Rohe was the designer of the chair, and aver that Lilly Reich was the designer of the chair.   Defendants admit that architects, the furniture trade and the public have come to generically refer to the style of the stool shown in Paragraph 19 of the Amended Complaint as the "Flat Brno Chair," but are without knowledge or information as to whether said architects, the furniture trade and the public refer to the Flat Brno Chair by that name because they associate the chair with Knoll.  Defendants aver that the Flat Brno Chair has become a generic furniture design.

### B. THE BARCELONA TABLE

20. Defendants have no personal knowledge as to whether Ludwid Mies van der Rohe designed the Tudendhat House.  Defendants deny that Ludwig Mies van der Rohe was the designer of the table, and aver that Lilly Reich was the designer of the table.   Defendants admit that architects, the furniture trade and the public have come to generically refer to the style of the stool shown in

Paragraph 20 of the Amended Complaint as the "Barcelona Table," but are without knowledge or information as to whether said architects, the furniture trade and the public refer to the Barcelona Table by that name because they associate the table with Knoll.  Defendants aver that the Barcelona Table has become a generic furniture design.

### KNOLL AND ITS RIGHTS IN THE COLLECTION

21. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 21 of the Amended Complaint.  Further, Defendants aver that Plaintiff fails to allege what rights, if any, Ludwig Mies van der Roth assigned to the predecessors of Knoll; Plaintiff fails to allege whether the rights originated under Trademark law, Copyright law, Patent law, or some other type of law.  Further, Defendants aver that Plaintiff fails to allege that Knoll or its predecessors acquired any rights to the furniture from Lillian Reich.

22. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 22 of the Amended Complaint.

23. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 23 of the Amended Complaint.

24. Admit that Knoll alleges the works of Ludwig Mies van der Rohe may be found in certain museums.

25. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 25 of the Amended Complaint. Further, Defendants aver that Paragraph 25 alleges that some pieces of the collection may have been at the museum since before Knoll claims to have acquired any rights therein.

26. Defendants are without knowledge or information sufficient to form a belief as to the

truth of the allegations set forth in Paragraph 26 of the Amended Complaint.

27. Defendants deny the allegations set forth in Paragraph 27 of the Amended Complaint.
Further, Defendants aver that the furniture designs listed above (the Barcelona Collection), which are
claimed by Knoll to be trademarks, are generic furniture designs.  Further, Defendants aver that any
use of Plaintiff's BARECELONA by Defendants is allowed under Trademark fair use, and further
that the BARCELONA trademark is generic.

## KNOLL'S RELEVANT TRADEMARK REGISTRATION

28. Defendants do not herein respond to any legal assertions or conclusions alleged directly
or by implication by Knoll, and aver only that the records of the Patent and Trademark Office speak
for themselves.

29. Defendants do not herein respond to any legal assertions or conclusions alleged directly
or by implication by Knoll, and aver only that the records of the Patent and Trademark Office speak
for themselves.

30. Defendants do not herein respond to any legal assertions or conclusions alleged directly
or by implication by Knoll, and aver only that the records of the Patent and Trademark Office speak
for themselves.

31. Defendants do not herein respond to any legal assertions or conclusions alleged directly
or by implication by Knoll, and aver only that the records of the Patent and Trademark Office speak
for themselves.

32. Defendants do not herein respond to any legal assertions or conclusions alleged directly
or by implication by Knoll, and aver only that the records of the Patent and Trademark Office speak
for themselves.

33. Defendants do not herein respond to any legal assertions or conclusions alleged directly

or by implication by Knoll, and aver only that the records of the Patent and Trademark Office speak for themselves.

MODERNO, INC., AND URBAN MOD, INC.

34. Defendants admit that they sell modern furniture and related products.

35. Denied.  Defendants sell nothing that is subject to any valid Trademark that Plaintiff may possess.

36. Denied.  Defendants sell nothing that is subject to any valid Trademark that Plaintiff may possess.

RESPONSE TO COUNT I

37. Defendants repeat their responses as set forth in paragraphs 1-36 above.

38. Denied to the extent that Plaintiff is alleging or implying that Defendants require Plaintiff's permission to sell public domain products.

39.  Defendants deny having knowledge that Knoll possesses valid trademark rights in any product offered for sale on Regencyshop.com, and aver that Defendants have a good faith belief that Knoll does not possess, and knows it does not possess, any valid trademark rights in any products offered for sale by Regencyshop.com.

40. Defendants deny having knowledge that Knoll possesses valid trademark rights in any product offered for sale on Regencyshop.com, and aver that Defendants have a good faith belief that Knoll does not possess, and knows it does not possess, any valid trademark rights in any products offered for sale by Regencyshop.com.

41. Defendants deny the allegations set forth in Paragraph 41 of the Amended Complaint.

42. Defendants deny the allegations set forth in Paragraph 42 of the Amended Complaint.

43. Defendants deny the allegations set forth in Paragraph 43 of the Amended Complaint.

45

<u>**RESPONSE TO COUNT II**</u>

44. Defendants repeat their responses as set forth in paragraphs 1-43 above.

45. Defendants admit that they have offered the Barcelona Collection[75] for sale on their website, however, Defendants deny that they require authorization from Plaintiff to offer the Barcelona Collection for sale.  Defendants deny that Plaintiff owns the designs to the Barcelona Collection, and further deny that Plaintiff holds valid trademarks in the Barcelona Collection.

46. Defendants deny the allegations set forth in Paragraph 46 of the Amended Complaint.

47. Defendants deny the allegations set forth in Paragraph 47 of the Amended Complaint.

48. Defendants deny the allegations set forth in Paragraph 48 of the Amended Complaint.

<u>**RESPONSE TO COUNT III**</u>

49. Defendants repeat their responses as set forth in paragraphs 1-48 above.

50. Defendants deny the allegations set forth in Paragraph 50 of the Amended Complaint.

51. Defendants deny the allegations set forth in Paragraph 51 of the Amended Complaint.

52. Defendants deny the allegations set forth in Paragraph 52 of the Amended Complaint.

53. Defendants deny the allegations set forth in Paragraph 53 of the Amended Complaint.

<u>**RESPONSE TO COUNT IV**</u>

54. Defendants repeat their responses as set forth in paragraphs 1-53 above.

55. Defendants deny the allegations set forth in Paragraph 55 of the Amended Complaint.

56. Defendants specifically deny that they need or require the permission, license or consent of Plaintiff to market or sale the furniture designs which are the subject of this civil action, and generally denies the remaining allegations set forth in Paragraph 56 of the Amended Complaint.

57. Defendants deny the allegations set forth in Paragraph 57 of the Amended Complaint.

---

[75] The Barcelona Collection is comprised of the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, and the Brno Chair.

## FURTHER ANSWER AND AFFIRMATIVE DEFENSES

By way of further answer, Defendants deny that they are liable to Plaintiff on any of the claims alleged and deny that Plaintiff is entitled to damages, treble or punitive damages, equitable relief, attorneys' fees, costs, or to any relief whatsoever, and states as follows:

## FIRST AFFIRMATIVE DEFENSE
### (Fraud on the PTO)

58. On information and belief, in each application for the registration of the product designs at issue, Plaintiff made the following statement: "The mark has become distinctive by reason of substantially exclusive and continuous use in interstate commerce by applicant and its predecessor in interest as to the rights herein claimed in connection with the goods listed in the application for at least five (5) years preceding the date of this application (emphasis added)." The applications were filed on October 22, 2003.

59. On information and belief, in the Declaration supporting each application for the registration of its product designs at issue, Carl G. Magnusson, Executive Vice President and Director of Design of Plaintiff, stated the following: "[t]hat to the best of my knowledge and belief, no other person, firm, corporation or association has the right to use said mark in commerce." The Declarations were signed on September 30, 2003.

60. On information and belief, at the time the aforementioned Declarations were signed and the aforementioned applications were filed, there was extensive third-party usage of the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, and Flat Brno Chair designs.

61. On information and belief, at the time the aforementioned Declarations were signed and the aforementioned applications were filed, Plaintiff knew, or reasonably should have

known, that there was extensive third-party usage of the Barcelona Chair, Barcelona Stool,

Barcelona Couch, Barcelona Table, and Flat Brno Chair designs.

62. On information and belief, the aforementioned third-parties had the legal rights to

manufacture, import, sell, offer for sale, advertise and distribute the Barcelona Chair, Barcelona

Stool, Barcelona Couch, Barcelona Table, and Flat Brno Chair designs.

63. On information and belief, Plaintiff knew, or reasonably should have known, that the

third parties had rights that were at least equivalent to those of plaintiff to manufacture, import,

sell, offer for sale, advertise and distribute the Barcelona Chair, Barcelona Stool, Barcelona

Couch, Barcelona Table, and Flat Brno Chair and had no reasonable basis for believing

otherwise.

64. On information and belief, Knoll also fraudulently stated to the PTO that the Designs

were not subject to patent protection or applications. On information, and belief, in his

declarations in support of Knoll's Design applications, Mr. Magnusson stated that the Designs

were not subject to any patent protection or application.  On information and belief, this

statement was known by Mr. Magnusson to be misleading and that several patents were relevant

and material to the PTO's decision to issue the registrations. Thus, the misrepresentation was both

knowing and material.

65. In failing to disclose to the United States Patent and Trademark Office those third

parties, as well as Defendant, with rights equivalent to those of Plaintiff to manufacture, import,

sell, offer for sale, advertise and distribute the Barcelona Chair, Barcelona Stool, Barcelona

Couch, Barcelona Table, and Flat Brno Chair, Plaintiff made a material misrepresentation-by-

omission that was intended to procure trademark registrations to which Plaintiff was not entitled.

66. In failing to disclose to the United States Patent and Trademark Office existence of three utility patents in  the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, and Flat Brno Chair, Plaintiff made a material misrepresentation-by-omission that was intended to procure trademark registrations to which Plaintiff was not entitled. This defense is available against an incontestable trademark.

## SECOND AFFIRMATIVE DEFENSE
### (Functionality)

67. The furniture items that Plaintiff has trademarked are functional.  The designs were previously under patent. However, the patents have expired, and the furniture items are now part of the public domain. This defense is available against an incontestable trademark as the use of the term "incontestable" is misleading. Defendants can contest an "incontestable" trademark on over 20 grounds.[76]

## THIRD AFFIRMATIVE DEFENSE
### (Failure to Allege Non-Functionality)

68. The Amended Complaint fails to allege or specify any non-functional aspects of Plaintiff's trademarks over the design of the Barcelona Collection[77], or insufficiently allege non-functionality.  Plaintiffs must prove non-functionality in making their prima facie case, and by failing to allege non-functionality, Plaintiffs fail to allege all the necessary elements to prove infringement. This defense is available against an incontestable trademark.

## FOURTH AFFIRMATIVE DEFENSE
### (Lack of Confusion)

69. Defendants have inserted disclaimers into relevant pages of Regencyshop.com that

---

[76] See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 206 n.1 (1985) (Stevens, J., dissenting); Carter, Trade-mark "Incon-testability", 36 TRADEMARK REP. 185 (1946); Williamson, Trade-marks Registered under the Lanham Act are not "Incontestable", 37 TRADEMARK REP. 404 (1947);

[77] The Barcelona Collection is comprised of the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, and the Brno Chair.  Defendants/Counter-Plaintiffs use this term not as an indication of source or trademark, but rather to describe the aforesaid furniture products, and to describe the designs of said furniture.

render it impossible for any rational consumer to be misled or confused, or likely to be misled or confused, into thinking that Defendant's products, sold under their IBIZA trademark, come from Knoll or that Defendants have any affiliation or other business agreement with Knoll. This defense is available against an incontestable trademark.

### FIFTH AFFIRMATIVE DEFENSE
### (Abandonment and Estoppel)

70. On information and belief, Knoll disclaimed ownership of trademark rights in the Barcelona Collection, and did not enforce any trademark rights in the Barcelona Collection for decades, despite the many other companies that produced the Barcelona Collection.  Knoll therefore abandoned any trademark rights it acquired from Ludwig Mies van der Rohe in the Barcelona Collection, and is estopped from asserting any trademark rights in the Barcelona Collection.  This defense is available against an incontestable trademark.

71. On information and belief, Knoll has entered into licensing agreements with at least 15 parties to allow said parties to produce and sell the Barcelona Collection.  On information and belief, the licenses are naked licenses, and that Knoll does not police the quality of the Barcelona Collection produced by the licensees.  Thus, Knoll has abandoned any trademark rights it has in the Barcelona Collection, and is estopped from asserting any trademark rights in the Barcelona Collection.  This defense is available against an incontestable trademark.

### SIXTH AFFIRMATIVE DEFENSE
### (Public Domain)

72.      On information and belief, the Barcelona Collection was in the public domain prior to the date it was allegedly acquired by Knoll. This defense is available against an incontestable trademark.

**73.**

50

## SEVENTH AFFIRMATIVE DEFENSE
**(Laches)**

73. This suit is barred by laches.  On information and belief, Knoll disclaimed ownership of trademark rights in the Barcelona Collection, and did not enforce any trademark rights in the Barcelona Collection for decades, despite the many other companies that produced the Barcelona Collection.  This defense is available against an incontestable trademark.

## EIGHT AFFIRMATIVE DEFENSE
**(Failure to Acquire Exclusive Rights)**

74. On information and belief, the Barcelona Collection was in part designed by Lillian Reich and Knoll has failed to allege that it acquired rights from her as it claims it acquired rights from Ludwig Mies van der Rohe.

## NINTH AFFIRMATIVE DEFENSE
**(Fair Use)**

75. Defendants actions are permissible under the Lanham Act Fair Use exception, found in 15 USC §1115(b)(4).  Specifically, Defendants use of Plaintiff's BARCELONA word mark was not as a trademark, but rather was descriptive of Defendants' product and was used fairly and in good faith only to describe Defendants' products.  In addition, the Barcelona Collection was not used as a trademark, but rather was used fairly and in good faith only as a product.  This defense is available against an incontestable trademark.

## TENTH AFFIRMATIVE DEFENSE
**(Generic)**

76. On information and belief, the term BARCELONA has become generic as an indication of modern furniture similar to the furniture designed by Ludwig Mies van der Rohe and Lillian Reich.  On information and belief, the Barcelona Collection has become generic as a type of modern furniture.  This defense is available against an incontestable trademark.

### ELEVENTH AFFIRMATIVE DEFENSE
**(Trademark Misuse and Violation of Antitrust laws)**

77. On information and belief, Plaintiff is using the Barcelona Collection trademarks to create a monopoly for Barcelona Collection furniture designs rather than to protect their trademarks in the Barcelona Collection.

78. On information and belief, Plaintiff has filed at least 22 lawsuits against small business owners, not in an attempt to use the courts to legitimately protect their trademark rights, but in an effort to eliminate any competition in producing the Barcelona Collection.  On information and belief, Plaintiff has chosen small businesses because of the lack of resources that those small businesses possess, and in the expectation that the small businesses will be eager to settle, so as to avoid expensive litigation.

79. Plaintiff's actions are both in violation of the antitrust laws, and amount to trademark misuse. This defense is available against an incontestable trademark.

### TWELTH AFFIRMATIVE DEFENSE
**(Aesthetic Functionality)**

80. On information and belief, the Barcelona Collection embodies designs that are aesthetically pleasing, and consumers choose to purchase the Barcelona Collection primarily because of the design of the Barcelona Collection.  The Barcelona Collection trademarks are thus invalid because of the doctrine of aesthetic functionality.  This defense is available against an incontestable trademark.

### THIRTEENTH AFFIRMATIVE DEFENSE
**(Failure to State a Claim)**

81. The Amended Complaint, or one or more counts set therein, fails to state a claim upon which relief can be granted. This defense is available against an incontestable trademark.

**82.**

FOURTEENTH AFFIRMATIVE DEFENSE

(Plaintiff's Federal Trademark Registrations on the Barcelona Collection are Invalid Because the Designs have not acquired Distinctiveness or Secondary Meaning)

82. Incontestability doctrine provides certain bases on which a registration may not be challenged after five years. In the Second Circuit, in (*inter alia*) *Knitwaves* has ruled that the generic/descriptive/suggestive, etc. rubric simply does not apply in the trade dress context. If the trademark rubric cannot be applied to a product configuration trade dress, the incontestability safe harbor cannot, by definition, apply to trade dress registrations. Additionally, a finding of fraud on the USPTO does knocks out the mark's "incontestable" status and its registration, under §1115(b)(1). In *Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.,* 40 F.3d 1431 (3d Cir.1994), the Third Circuit Court of Appeals held,

"Some courts have nonchalantly applied the trademark generic/descriptive/ suggestive/arbitrary/fanciful taxonomy in the product configuration context (though none of them has inquired whether it makes sense to do so), see, e.g., *Braun, Inc. v. Dynamics Corp. of America*, 975 F.2d 815, 825 n. 18 (Fed.Cir.1992) (design of a blender); But we do not think it helpful or proper to transplant the categorical distinctiveness inquiry developed for trademarks to product configurations, where the alleged trade dress lies in the very product itself. See Martin P. Hoffman, *Trade Dress/Product Simulation Overview,* C913 ALI–ABA 219, 222 (1994) ("The [trademark distinctiveness] categories do not fit trade dress considerations very well...."). The difficulty is that, perhaps unlike product packaging, a product configuration differs fundamentally from a product's trademark, insofar as it is not a symbol according to which one can relate the signifier (the trademark, or perhaps the packaging) to the signified (the product). Being constitutive of the product itself and thus having no such dialectical relationship to the product, the product's configuration cannot be said to be "suggestive" or "descriptive" of the product, or "arbitrary" or "fanciful" in relation to it. See Jay Dratler, Jr., *Trademark Protection for Industrial Design*, 1988 U.ILL.L.REV. 887, 903 ("Unlike verbal marks, designs do not describe anything; they 'just are.' "); Ralph S. Brown, Design Protection: An Overview, 34 UCLA L.REV. 1337, 1380 (1987) (same); Melissa R. Gleiberman, Note, *From Fast Food to Fast Cars: Overbroad Protection of Product Trade Dress Under Section 43(a) of the Lanham Act*, 45 STAN.L.REV. 2037, 2042–43 (1993) [hereinafter Gleiberman, Note, Overbroad Protection of Product Trade Dress ] (same); cf. WILLIAM H. BROWNE, A TREATISE ON THE LAW OF TRADE–MARKS § 130, at 87 (1873)). The very basis for the trademark taxonomy—the descriptive relationship between the mark and the product, along with the degree to which the mark describes the product— is unsuited for application to the product itself.  Accordingly, for all the aforementioned

considerations, we conclude that the trademark taxonomy, carefully and precisely crafted through a long succession of cases to accommodate the particularities of trademarks, does not fit the quite different considerations applicable to product configurations.See  *Hanig & Co. v. Fisher & Co.,* No. 92–C–1779, 1994 WL 97758, at *4 (N.D.Ill. Mar. 24, 1994)

83.      Plaintiff does not have any valid trademark rights in the designs of the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, or the Barcelona word mark because the design of those pieces of furniture have not acquired distinctiveness or secondary meaning pointing uniquely and exclusively to one source, namely Plaintiff.

84.      A product can never be a distinctive trademark for itself as its primary meaning can never be engulfed by a secondary meaning for its own product category.  Hence the Barcelona furniture can never serve as a trademark for itself or its own product configuration.

85.      The following trademark registrations issued to Plaintiff are invalid because they have not acquired distinctiveness or secondary meaning:

Registration No. 2,893,025 is for the configuration Barcelona chair.

Registration No, 2,894,977 is for the configuration Barcelona ottoman.

Registration No. 2,894,980 is for the configuration Barcelona couch.

Registration No. 2,894,979 is for the configuration Barcelona table.

Registration No. 2,894,978 is for the configuration of Brno chair.

Registration No. 772,313, for the BARCELONA word mark.

### FIFTEENTH AFFIRMATIVE DEFENSE
(Plaintiff s Federal Trademark Registrations For The Furniture Designs Are Invalid Because The Product Designs Are Merely Decorative Or Ornamental Features and Not Trademarks)

86.      Incontestability doctrine provides certain bases on which a registration may not be challenged after five years. In the Second Circuit, in (*inter alia*) <u>Knitwaves</u> has ruled that the

generic/descriptive/suggestive, etc. rubric simply does not apply in the trade dress context. If the trademark rubric cannot be applied to a product configuration trade dress the incontestability safe harbor cannot, by definition, apply to trade dress registrations. Additionally, a finding of fraud on the USPTO does knocks out the mark's "incontestable" status, and its registration, under §1115(b)(1).

87.     Plaintiff does not have any valid proprietary rights in the designs of the Barcelona Chair, Barcelona Stool, Barcelona Couch, Barcelona Table, and the Barcelona word mark because the design of those furniture pieces are merely decorative or ornamental features and, as such, they are neither trademarks, nor have they been used as trademarks by Plaintiff.

88.     The following trademark registrations issued to Plaintiff are invalid because the subject matter of the registrations are not trademarks:

Registration No. 2,893,025 is for the configuration Barcelona chair.

Registration No, 2,894,977 is for the configuration Barcelona ottoman.

Registration No. 2,894,980 is for the configuration Barcelona couch.

Registration No. 2,894,979 is for the configuration Barcelona table.

Registration No. 2,894,978 is for the configuration of Brno chair.

Registration No. 772,313, for the BARCELONA word mark.

### SIXTEENTH AFFIRMATIVE DEFENSE
(Plaintiff s Federal Trademark Registrations For The BARCELONA Word Mark is Invalid Because the Word Mark is Geographically Misdescriptive)

88. Ludwig Mies van der Rohe (Mies) and Lilly Reich were hired by the German government to design furniture for the German Pavilion, Germany's entry for the World Fair of 1929.[78] The most popular items from these World Fair get the benefit of free association with the

---

[78] SONJA GÜNTHER, LILLY REICH, 1885-1947: INNENARCHITEKTIN, DESIGNERIN, AUSTELLUNGSGESTALTERIN (GERMAN ED.), (1988).

brand goodwill of these expositions, as the name of the exposition becomes an adjective to describe the product itself.[79] For example, the German furniture designed by Lilly Reich came to be known as the Barcelona furniture.[80]

89. Historically, as explained above, furniture designed by Lilly Reich had been historically and continuously described as Barcelona furniture decades before Knoll acquired any rights on the Barcelona WordMark.

90. Moreover, the Barcelona WordMark freely appropriates the brand goodwill of International Exhibitions Bureau (BIE) which organized the Barcelona world fair in 1929.

91. The following trademark registrations issued to Plaintiff are invalid because they are geographically misdescriptive.

Registration No. 772,313, for the BARCELONA word mark.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

92. Knoll's claims are barred, in whole or in part, by the doctrine of unclean hands.

**PRAYER FOR RELIEF**

WHEREFORE, Defendants respectfully pray that the Court enter judgment as follows:

(a) find that the trademarks, numbers 2,893,025 (Barcelona Chair), 2,894,977 (Barcelona Stool), 2,894,980 (Barcelona Couch), 2,894,979 (Barcelona Table), 2,894,978 (Flat Brno Chair), and 772,313 (BARCELONA word mark), are invalid and should be cancelled;

(b) find that Plaintiff Knoll fraudulently registered the trademarks numbers 2,893,025 (Barcelona Chair), 2,894,977 (Barcelona Stool), 2,894,980 (Barcelona Couch), 2,894,979 (Barcelona Table), and 2,894,978 (Flat Brno Chair);

---

[79] *Id.* at 11.
[80] CHRISTIANE LANGE, LUDWIG MIES VAN DER ROHE & LILLY REICH: FURNITURE AND INTERIORS (2007).

(c) Find that Defendants have never offered, and are not now offering, goods that could cause confusion or a likelihood of confusion with any of the trademarks asserted by Knoll in this action, and have not infringed any such trademarks;

(d) Find that Defendants have never engaged in any action that would threaten, and are not now engaging in any activity that would threaten Plaintiff with any harm, including irreparable harm;

(e) Find that the allegedly trademark-protected designs are functional and in the public domain;

(f) Find that any trademark rights in the designs in questions were abandoned by Knoll or a predecessor company;

(g) Find that this action is a strike suit that has been brought for anticompetitive reasons, in bad faith, with unclean hands, and by a misuse of alleged trademark rights;

(h) Find that this action is barred by laches;

(i) Knoll is hereby enjoined from attempting in any way, in any forum, to suggest that it has valid trademark registrations in the Barcelona furniture, or that the said products are not in the public domain;

(j) Plaintiff shall pay the costs of this action together with Defendants' attorneys' fees; and

(k) Defendants further pray for such other and further relief as the Court may find just and proper in the premises.

Dated: July 10, 2012                                    Respectfully Submitted,

                                                        By: s/ Janeen Lambert

                                                        Janeen Lambert
                                                        104 Marcy Ave, #3
                                                        Brooklyn, NY 11211
                                                        517-303-5746
                                                        Fax: 917-210-3289
                                                        Janeen.Lambert@gmail.com

**Exhibit 1:  LILLY REICH,** The Real Designer of the Barcelona Furniture

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

KNOLL, INC.

                         Plaintiff and Counter-
                         Defendant,                    No. 11 Civ. 0488 (AKH)

     -against-                          ECF Case

MODERNO, INC. AND URBAN MOD, INC. d/b/a
REGENCY SHOP, AND MIKE SAXENA

                         Defendants and Counter-
                         Plaintiffs.

_____


    The within Amended and Supplemental Countercomplaint and Second Amended

Answer, were served on all parties on July 10, 2012, by the ECF filing system.

Dated: July 10, 2012

                                     By: s/ Janeen Lambert
                                        Janeen Lambert